[No. B112612. Second Dist., Div. Four. Jan. 26, 2001.]

SHARON RUFO et al., Plaintiffs and Respondents, v.
ORENTHAL JAMES SIMPSON, Defendant and Appellant.

578

## COUNSEL

Baker, Silberberg & Keener, Robert C. Baker and Daniel Patrick Leonard for Defendant and Appellant.

Hornberger, Ghazarians & Brewer and Michael A. Brewer for Plaintiff and Respondent Sharon Rufo.

Mitchell Silberberg & Knupp, Thomas P. Lambert, Peter B. Gelblum, Yvette Molinaro, Jeffrey D. Goldman; O'Melveny & Myers and Daniel M. Petrocelli for Plaintiff and Respondent Fredric Goldman.

Edward J. Horowitz and John Quinlan Kelly for Plaintiff and Respondent Louis H. Brown.

## OPINION

## VOGEL (C. S.), P. J.—

### INTRODUCTION

These consolidated civil actions arise from the murders of Nicole Brown Simpson and Ronald Lyle Goldman. A jury found that defendant Orenthal James (O.J.) Simpson committed these homicides willfully and wrongfully, with oppression and malice. Sharon Rufo and Fredric Goldman, the parents and heirs of Ronald Goldman, were awarded $8.5 million compensatory damages on their cause of action for wrongful death. (Code Civ. Proc., §§ 377.60, 377.61.) Fredric Goldman as personal representative of the estate of Ronald Goldman was awarded minor compensatory damages and $12.5 million punitive damages on the survival action, the cause of action Ronald Goldman would have had if he survived. (Code Civ. Proc., §§ 377.30, 377.34.) Louis H. Brown as personal representative of the estate of Nicole Brown Simpson was awarded minor compensatory damages and $12.5 million punitive damages on the survival action, the cause of action Nicole Brown Simpson would have had if she survived. Defendant Simpson appeals from the judgments.

Defendant does not contend that the evidence is legally insufficient to show that he is the person who committed the murders. He seeks reversal for a new trial on the grounds that the trial court committed reversible error in numerous rulings on admission and exclusion of evidence and in denying a mistrial based on juror misconduct. He also contends the compensatory and punitive damages awards are excessive as a matter of law. We conclude the trial court did not err, and the compensatory and punitive damages are not excessive. We affirm the judgments.

Decedent Ronald Goldman has the same last name as one of the present parties, plaintiff Fredric Goldman. Decedent Nicole Brown Simpson shares the names of two of the present parties, plaintiff Louis H. Brown and defendant Orenthal James Simpson. For clarity in the narrative and discussion that follow, we refer to the present parties by their last names (i.e., Goldman is plaintiff Fredric Goldman, and Simpson is defendant Orenthal James Simpson), and to the decedents by their first names, Ronald and Nicole.

## FACTS

In a prior criminal trial, Simpson was acquitted of the murders of Nicole and Ronald. In the present civil trial, the jury concluded that Simpson killed Nicole and Ronald. Simpson does not contend on appeal that the evidence is legally insufficient to support the jury's verdict. He contends, however, that the judgments should be reversed for a new trial on the grounds that evidence was erroneously admitted or excluded and the award of damages is excessive.

No exhaustive summary of the underlying facts is necessary. Factual details relating to admission or exclusion of the disputed items of evidence are addressed in the discussion of those issues. The following summary is sufficient to give context to the legal discussion that follows.

Nicole and Ronald were stabbed to death on the night of June 12, 1994, in front of Nicole's home on Bundy Drive in Los Angeles.

Plaintiffs contended that Simpson, Nicole's ex-husband, had the motive to kill Nicole in a rage. On several prior occasions during their marriage Simpson had physically abused Nicole. In 1992 they separated. In May 1993 they agreed to try for a year to see if they might reconcile. In April 1994 Simpson was encouraged they would reconcile. But on May 22, 1994, Nicole terminated the relationship. Simpson retaliated by threatening to cause serious income tax problems for Nicole concerning their arrangement

regarding his residence on Rockingham Avenue in Los Angeles. On June 7, 1994, Nicole telephoned a battered women's shelter hotline and stated she was frightened because her ex-husband was stalking her, and she sought advice whether it might be safer to move back in with him. By the end of that conversation she decided not to move back with him. On June 12, 1994, Simpson's and Nicole's young daughter performed in a dance recital. Simpson flew from New York to Los Angeles to attend it. Simpson was in a foul mood that day. At the dance recital, Simpson and Nicole sat apart and did not interact. When the recital ended, Nicole excluded Simpson from a post-recital family dinner.

Ronald was a waiter at the restaurant where the dinner occurred. Afterwards, Nicole telephoned the restaurant about a pair of eyeglasses left at the dinner. Ronald may have been killed because he encountered the murder of Nicole while delivering the eyeglasses to her home.

Shortly after the killings, Nicole's and Ronald's bodies were found in front of her residence. Police responded to the scene and collected physical evidence. Numerous drops of blood at the scene were proved by DNA evidence to be Simpson's. There was a left-hand leather glove, of a rare make that Nicole had previously purchased for Simpson, that matched the right-hand glove later found at Simpson's residence. Bloody footprints at the scene were made by distinctive luxury shoes similar to those worn by Simpson in the past. A knit cap at the scene contained hair fibers matching Simpson's hair. Ronald's shirt contained hair fibers matching Simpson's hair, and cloth fibers matching bloodstained socks found at Simpson's residence.

Other physical evidence from Simpson's Ford Bronco and Simpson's home on Rockingham pointed to Simpson as the murderer. The Bronco contained blood from Simpson, Nicole, and Ronald. Simpson's freshly dripped blood was found on his driveway. Simpson had recent cuts and abrasions on his hands. The right-hand glove matching the left-hand glove from the crime scene was found on a path next to Simpson's house. This glove contained Simpson's blood, Nicole's blood, Ronald's blood, Nicole's hair, and Ronald's hair. A pair of socks found in Simpson's bedroom contained Simpson's and Nicole's blood.

Faced with overwhelming physical evidence, the defense suggested that some evidence was planted by police officers or ineptly contaminated during collection, storage, or testing.

Simpson testified and claimed that he was at home on Rockingham during the time of the killings, prior to being picked up by a limousine driver for a

ride to the airport to fly to a previously scheduled event in Chicago. Plaintiffs presented evidence that Simpson had time to commit the murders, go home, catch his ride to the airport, and dispose of evidence in a small bag that he would not allow the limousine driver to handle and which was never seen again. On the flight back to Los Angeles after being notified of Nicole's death, Simpson told a passenger that there were two victims killed in the garden area of Nicole's house, although those details had not been provided to him in the notification. After being informed that police were going to arrest him, Simpson and a friend fled in Simpson's Bronco. Simpson had his passport, a fake goatee and mustache, $8,000 to $9,000 in cash, and a loaded gun. Simpson talked about committing suicide.

## CONTENTIONS

Simpson contends the trial court erred in admitting evidence that Simpson previously abused Nicole.

Simpson contends the trial court erred in admitting evidence of statements made by Nicole, which he contends were inadmissible hearsay or irrelevant. Simpson contends the trial court erred in excluding defense evidence of prior testimony of Mark Fuhrman, and of validation studies performed at the Los Angeles police crime laboratory.

Simpson contends the trial court erred in denying a mistrial after plaintiffs' counsel referred to Simpson's alleged failure to pass a polygraph test, or after a juror's misconduct was discovered.

Simpson contends the compensatory damages awarded to the parents of Ronald on their action for wrongful death are excessive.

Simpson contends the trial court erroneously admitted expert opinion on the value of Simpson's name and likeness as an element of his present net worth, and that the punitive damages awarded are excessive.

We find no merit to any of these contentions and therefore we affirm the judgments.

## ADMISSIBILITY OF SIMPSON'S PRIOR ABUSE OF NICOLE

■ Simpson contends the trial court erred in admitting evidence of five instances of Simpson's prior abuse of Nicole. This evidence showed: (1) outside a veterinary clinic around the spring of 1983, Simpson approached

Nicole's car, tried to pull off Nicole's fur coat, and hit Nicole in the face, saying he "didn't buy this fur coat for you to go fuck somebody else"; (2) in 1984, Simpson lost his temper and struck Nicole's Mercedes with a baseball bat; (3) at a public beach in July 1986, Simpson slapped Nicole and she fell to the sand; (4) on New Year's Day 1989, Simpson and Nicole had a violent argument during which he pulled her hair and struck her on the face or head, for which Simpson pleaded nolo contendere to spousal abuse; and (5) during a rage in October 1993, Simpson broke a door of Nicole's residence.

Simpson contends this evidence showed nothing more than bad character or a propensity for violence, which is inadmissible under Evidence Code section 1101, subdivision (a).[1] But that section further provides, "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 [27 Cal.Rptr.2d 646, 867 P.2d 757].) The trial court denied Simpson's motion in limine to exclude this evidence. The court ruled the evidence was admissible to show motive, intent, and identity.

Simpson contends that since he denied being the perpetrator, the intent with which the killings were committed was not genuinely in issue. He contends the prior instances of abuse did not tend to establish a motive for these killings and were not similar to these killings. He misplaces reliance on cases stating that in order to be admissible to prove identity, prior acts and charged acts must bear striking and distinctive similarities so as to support a reasonable inference that the same person committed both. (*People v. Ewoldt, supra,* 7 Cal.4th at p. 403; *People v. Haston* (1968) 69 Cal.2d 233, 246 [70 Cal.Rptr. 419, 444 P.2d 91].)

The requirement for a distinctive modus operandi does not apply when the prior and charged acts involve the same perpetrator and the same victim. The courts have concluded that evidence of prior quarrels between the same parties is obviously relevant on the issue whether the accused committed the charged acts. (*People v. Cartier* (1960) 54 Cal.2d 300, 311 [5 Cal.Rptr. 573, 353 P.2d 53]; *People v. Daniels* (1971) 16 Cal.App.3d 36, 46 [93 Cal.Rptr. 628]; *People v. Haylock* (1980) 113 Cal.App.3d 146, 150 [169 Cal.Rptr.

---

[1]Evidence Code section 1101, subdivision (a) provides, "Except as provided in this section [and certain other sections], evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

658]; *People v. Zack* (1986) 184 Cal.App.3d 409, 413-415 [229 Cal.Rptr. 317]; *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1609-1614 [38 Cal.Rptr.2d 868]; see *People v. Beamon* (1973) 8 Cal.3d 625, 633 [105 Cal.Rptr. 681, 504 P.2d 905]; *People v. Benton* (1979) 100 Cal.App.3d 92, 98 [161 Cal.Rptr. 12]; *People v. McCray* (1997) 58 Cal.App.4th 159, 171-173 [67 Cal.Rptr.2d 872]; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1026 [92 Cal.Rptr.2d 208].)

*People v. Zack, supra,* 184 Cal.App.3d 409, discusses this principle. The defendant was convicted of murdering his wife, and the evidence included the defendant's prior assaults on her. After reviewing the precedents, the court concluded, "From these precedents, as well as common sense, experience, and logic, we distill the following rule: Where a defendant is charged with a violent crime and has or had a previous relationship with a victim, prior assaults upon the same victim, when offered on disputed issues, e.g., identity, intent, motive, etcetera, are admissible based solely upon the consideration of identical perpetrator and victim without resort to a 'distinctive modus operandi' analysis of other factors." (*Id.* at p. 415.) Similarly in *People v. Linkenauger, supra,* 32 Cal.App.4th 1603, the defendant was convicted of murdering his wife, and the evidence included prior marital discord and assaults on her. The court stated, "Appellant contends that evidence of marital discord and prior assaults does not support the inference that he intended to commit a premeditated murder. We disagree. The evidence had a tendency in reason to show appellant's intent to beat, torture, and ultimately murder JoAnn. It was properly admitted to show ill will and motive. . . . [¶] Evidence concerning marital discord and appellant's prior assaults also supports the inference that appellant committed the offense. . . . As we have indicated, by reason of the marital discord and his prior assaults upon JoAnn, the jury could logically draw the inference that appellant had again assaulted her." (*Id.* at pp. 1613-1614, citations omitted.) In *People v. Daniels, supra,* 16 Cal.App.3d 36, the defendant was convicted of attempted murder of his wife, and the evidence included prior assaults upon her. The court stated, "Evidence showing jealousy, quarrels, antagonism or enmity between an accused and the victim of a violent offense is proof of motive to commit the offense. . . . Likewise, evidence of threats of violence by an accused against the victim of an offense of violence is proof of the identity of the offender." (*Id.* at p. 46, citations omitted.)

Here the trial court correctly concluded the evidence of Simpson's prior abuse of Nicole was relevant to motive, intent, and identity. (*People v. Linkenauger, supra,* 32 Cal.App.4th at pp. 1613-1614.) The court did not

abuse its discretion under Evidence Code section 352[2] in concluding that the probative value of this evidence outweighed the potential prejudicial effect. (*People v. Linkenauger, supra*, 32 Cal.App.4th 1603, 1614; *People v. McCray, supra*, 58 Cal.App.4th 159, 173.) The fact that the prior instances occurred several years before the killings did not preclude their admission into evidence. (*People v. McCray, supra*, 58 Cal.App.4th at p. 173.) This fact merely affected the weight that the jury would accord to this evidence.

### HEARSAY ISSUES REGARDING VARIOUS STATEMENTS BY NICOLE

Simpson contends the trial court erred in admitting evidence of statements made by Nicole, which Simpson contends were inadmissible hearsay or irrelevant.[3] These may be divided into three categories: (1) statements made to police or security officers at the times of the 1984 and 1989 incidents discussed in the previous section, (2) statements made by telephone to a battered women's shelter on June 7, 1994, and (3) statements made in writing in Nicole's diary and a letter to Simpson.

#### *Factual Background*

*Statements at the Times of the Prior Incidents*

Concerning the 1984 incident in which Simpson struck Nicole's automobile with a baseball bat, Mark Day testified that he was a security patrol officer who was called to the Simpson residence on Rockingham in response to a disturbance. As he approached the front door Nicole came running across the front yard. She was very upset. She stated that "he" (Simpson) had lost his temper and that she was afraid. Day then observed the damage to the Mercedes and spoke to Simpson who admitted he had lost his temper.

Concerning the 1989 incident, Los Angeles Police Detective John Edwards went to the Rockingham residence in response to a 911 call. When Edwards buzzed at the gate of the residence, he observed Nicole, wearing only a bra and sweat pants, run from the bushes across the driveway to a control box and collapse onto it. She appeared to push on a button repeatedly

---

[2] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

[3] "(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] (b) Except as provided by law, hearsay evidence is inadmissible. [¶] (c) This section shall be known and may be cited as the hearsay rule." (Evid. Code, § 1200.)

while yelling to Edwards, "he's going to kill me, he's going to kill me." She then ran to the gate and when it opened she "came flying through that open area of the gate, ran directly to [Edwards] and collapsed onto [Edwards]." She was cold, wet, and shivering. "She was crying, she was hysterical, and appeared to be very frightened and exhausted." She repeated "he's going to kill me, he's going to kill me," and when Edwards inquired, who, she said O.J. Simpson. Edwards observed multiple injuries on her forehead, eye, cheek, lips, and neck and asked what happened. Nicole answered "O.J. had hit her, kicked her, slapped her, and pulled her hair."

*Telephone Call to Battered Women's Shelter*

After considering Simpson's motion to exclude the following evidence entirely, the court admitted it for the limited purpose of showing Nicole's state of mind.

Nancy Ney was a director of Sojourn House, a battered women's shelter. She had training regarding domestic abuse. She was on duty receiving calls on the shelter's telephone hot line on June 7, 1994, five days before the murders. She received a call from a woman who stated that her name was Nicole, she was Caucasian, she was in her 30's, she had been married eight years but was divorced, she had two children under age 10, she was living in West Los Angeles, and her ex-husband was famous.[4] Nicole stated that she was frightened. Her ex-husband had been calling her begging her to come back to him and he had been stalking her. She related that she found him staring at her in a restaurant and a market and following her when she drove. This unnerved her and she was frightened by it. Upon questioning by Ney whether her ex-husband had ever beaten her or threatened her, Nicole replied he had beaten her throughout the marriage and told her a few different times that if he ever caught her with another man he would kill her. Nicole asked for Ney's opinion whether it might be safer for her and the children to move back in with him. Ney and Nicole discussed this, and by the end of the conversation Nicole came to the conclusion that in the long run it would not be best for her to move back in with him. Nicole indicated she did not wish to come to the shelter. She thanked Ney for helping her and letting her express her feelings. Ney invited her to call back in a week but did not hear from her again.

---

[4] Ney had listened to a tape in evidence of a 911 call Nicole made on another occasion. Ney testified the voice on the tape was consistent with the voice of the woman Ney spoke to who identified herself as "Nicole."

*Written Statements*

*Diary Entries*

After considering Simpson's objection to the following evidence in its entirety, the court admitted it for the limited purpose of showing Nicole's state of mind.

Edited pages from Nicole's diary were admitted into evidence as exhibit No. 735. The entry for May 22, 1994, states "we[']ve officially split," and then describes the intended arrangements for child visitations. The entry for June 3, 1994, states that when Simpson came over to her residence at 8:30 p.m. to pick up the children for visitation, he commented to her, "You hung up on me last nite, you're gonna pay for this bitch, you're holding money from the IRS, you're going to jail you fucking cunt. You think you can do any fucking thing you want, you've got it coming—I've already talked to my lawyers about this bitch—they'll get you for tax evasion bitch I'll see to it. You're not gonna have a fucking dime left bitch." Nicole's entry adds, "I just turned around and walked away."

*Letter*

Portions of an undated letter in Nicole's handwriting addressing Simpson were introduced into evidence for the limited purpose of showing Nicole's state of mind. The redacted version, exhibit No. 732, includes the following: "O.J.[:] I think I have to put this all in a letter. A lot of years ago I used to do much better in a letter. I'm gonna try it again now. I'd like you to keep this letter if we split, so that you'll always know why we split. I'd also like you to keep it if we stay together, as a reminder. . . . There was also that time before Justin [was born and a few months] after Sydney [was born] I felt really good about how I got back in shape [and] we were out[,] you beat the holy hell out of me [and] we lied at the x-ray lab [and] said I fell off a bike. Remember!?? And since Justin['s] birth is the mad New Years Eve beat up. . . . I just don't see how that compares to infidelity, wife beating, verbal abuse. . . . And if I wanted to hurt you or had it in me to be anything like the person you are I would have done so after the New Year incident. But I didn't even do it then. I called the cops to save my life whether you believe it or not. But I didn't pursue anything after that. I didn't prosecute, I didn't call the press [and] didn't make a big charade out of it. I waited for it to die down and asked for it to. But I've never loved you since or been the same."

The trial court expressly limited the scope of this evidence to Nicole's state of mind and not the truth of what occurred in the underlying incidents.

In addition to instructing the jury generally that evidence admitted for a limited purpose may not be considered for any other purpose, the court at least twice instructed the jury specifically regarding the letter that it was admitted into evidence only "for the limited purpose of demonstrating Nicole Brown Simpson's state of mind regarding her relationship with defendant Simpson. You are not to consider any of the statements contained in that letter as evidence that the events described in the letter occurred."

## Discussion

### Spontaneous Statements to Police

As discussed in the previous section, the prior incidents of abuse were relevant and admissible to show motive, intent, and identity. Nicole's statements describing those incidents were therefore relevant, and they were admissible if they came within an exception to the hearsay rule. Nicole's statements to responding officers on the dates of the 1984 and 1989 incidents were properly admitted under the spontaneous statement exception to the hearsay rule. ▮ Evidence Code section 1240 provides, "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." This codifies a common law exception to hearsay. The requirements for this exception are: (1) there must be an occurrence startling enough to produce nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must be made before there has been time to contrive and misrepresent, while the nervous excitement still dominates and the reflective powers are still in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it. (*People v. Poggi* (1988) 45 Cal.3d 306, 318 [246 Cal.Rptr. 886, 753 P.2d 1082].) A statement that satisfies these elements is deemed sufficiently trustworthy to be received as evidence for the truth of the matter asserted despite its hearsay nature. (*Ibid.*; *People v. Hughey* (1987) 194 Cal.App.3d 1383, 1392-1393 [240 Cal.Rptr. 269].)

Simpson contends "a period of time had transpired between the event and the statements," and Nicole "had an opportunity to 'contrive and misrepresent' and to regain her 'reflective powers.'" The record supports the trial court's contrary conclusion. Whether the requirements of the spontaneous statement exception are satisfied in any given case is largely a question of fact. The determination of this question is vested in the trial court. The trial court necessarily exercises discretion in deciding it. The discretion of the

trial court is at its broadest when it determines whether the nervous excitement still dominated and the reflective powers were still in abeyance. (*People v. Poggi, supra*, 45 Cal.3d at pp. 318-319; *People v. Farmer* (1989) 47 Cal.3d 888, 904 [254 Cal.Rptr. 508, 765 P.2d 940].) The trial court here did not abuse its discretion in concluding Nicole's statements to the officers satisfied the spontaneous statement exception. (*People v. Poggi, supra*, 45 Cal.3d at pp. 319-320; *People v. Hughey, supra*, 194 Cal.App.3d 1383, 1388; *People v. Forgason* (1979) 99 Cal.App.3d 356, 365 [160 Cal.Rptr. 263].)

## State of Mind Evidence

Hearsay is a statement made other than while testifying as a witness, which statement is *offered in the trial to prove the truth of the matter asserted in the statement.* (Evid. Code, § 1200, subd. (a) [fn. 3, *ante*].) ■ Unlike the two statements to officers concerning prior incidents which were admitted to prove the truth of the matters asserted, the statements made in the telephone call to the battered women's shelter, the diary entries, and the letter were expressly limited to the purpose of showing Nicole's state of mind. Most of the statements were not hearsay at all, because they were not admitted to prove the truth of the matters asserted.

Thus, under plaintiffs' offers of evidence and the trial court's rulings and instructions limiting the purpose of the evidence, the statements made in the telephone call to the battered women's shelter were *not* admitted *to prove*: (a) that her ex-husband had been calling her, begging her to come back to him; (b) that he was stalking her; (c) that she found him staring at her in a restaurant and a market and following her vehicle; (d) that he had beaten her throughout the marriage; and (e) that he had told her different times that if he ever caught her with another man he would kill her. The statements in the diary were *not* admitted *to prove* that Nicole evaded taxes. The statements in the letter were *not* admitted *to prove*: (a) that Simpson beat Nicole and they lied to the X-ray lab that she fell off her bike; (b) that the "mad New Years Eve beat up" occurred; and (c) that Simpson committed "infidelity, wife beating, verbal abuse."

Rather, these statements were offered or admitted only as circumstantial evidence from which inferences could be drawn concerning how Nicole felt about the nature of the relationship between her and Simpson. They were offered to explain her conduct in finally terminating the relationship, which in turn was alleged to have provoked Simpson to murder. As such, they were not hearsay. (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389-390 [44 Cal.Rptr.2d 914]; 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, §§ 37-39, 198, pp. 719-721, 915.)

A few of the statements directly expressed Nicole's then state of mind: ▮ in the telephone call: (a) she was frightened; (b) she was unnerved and frightened by the perceived incidents of stalking; (c) she wanted advice because of uncertainty whether it was safer to move back in with her ex-husband; and (d) she concluded by the end of the conversation that she should not move back in with him; (2) in the diary: she and Simpson "officially split" as of May 22, 1994; (3) in the letter: (a) she called the police on New Years 1989 "to save her life"; and (b) since that incident she had never loved Simpson or been the same. These were hearsay to the extent they were offered to prove the truth of the matter asserted, Nicole's then feelings or state of mind. (*People v. Ortiz, supra,* 38 Cal.App.4th at pp. 389-390; 1 Witkin, Cal. Evidence, *supra,* Hearsay, § 198, p. 915.) But they were admissible under the state of mind exception to the hearsay rule. Evidence Code section 1250 provides, "(a) Subject to Section 1252,[5] evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant. [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

To avoid the force of plaintiffs' argument that all this evidence had a limited admissible purpose to show Nicole's state of mind, Simpson contends Nicole's state of mind was irrelevant. He is wrong.

This argument was raised early by Simpson's pretrial motion in limine to exclude all of the out-of-court statements by Nicole. Goldman's opposition to the motion in limine answered it as follows: "Here, Goldman contends that particular 'acts or conduct' of Nicole motivated Simpson to murder her: breaking off their relationship for good in May 1994, ignoring Simpson at their daughter's June 12 recital, and refusing to include Simpson in a family dinner and celebration immediately following the recital, after he had flown thousands of miles to be at the recital. Of course, Simpson's motive is a highly relevant issue because it is probative of the identity of the killer. See *People v. Zack,* 184 Cal.App.3d 409, 413-14[, *supra*]. Moreover, at his deposition, Simpson denied all of this conduct, contending that he (not Nicole) broke off the relationship, that he was not rejected by Nicole, that he

---

[5]Evidence Code section 1252 provides that a statement otherwise admissible under section 1250 is inadmissible if made under circumstances indicating its lack of trustworthiness, for example, with a motive to misrepresent or manufacture evidence.

interacted pleasantly with Nicole at the recital, and that he chose not to go out to dinner with the family. Thus, Nicole's state of mind—her fear of Simpson and intense hostility toward him for threatening to turn her [in to] the Internal Revenue Service and forcing her and their children to move out of their house—not only proves and explains why she engaged in the conduct that plaintiffs contend motivated Simpson to kill her, but also serves to rebut Simpson's claims to the contrary." In its pretrial ruling denying Simpson's motion in limine, the court indicated that although it would not make final determinations until specific evidence was offered at trial, it was reasonable to assume that the nature of the relationship between Simpson and Nicole would be a relevant issue.

Consistent with the pretrial memo, Goldman's counsel told the jury in his opening statement that the evidence would show Simpson and Nicole were engaged in a deeply emotional, tense, angry conflict in the weeks leading up to the killings, and that Simpson felt rejection and rage when Nicole attempted to end their relationship and excluded Simpson from the family circle and celebration at the recital and post-recital dinner. Counsel for Nicole's estate stated the evidence would show that in the weeks leading up to the killings Simpson's ego was bruised to its core by Nicole's finally ending the relationship, and on the night of the killings by his exclusion from the family circle, and he committed the killings in a rage. Counsel for Simpson told the jury the evidence would show the relationship between Simpson and Nicole was not acrimonious, Simpson was not out of control when they mutually decided to terminate the relationship and move on with their lives, and Simpson was not in a foul mood at the recital.

During trial, in his memorandum to the court about admissibility of the telephone call to the battered women's shelter, Simpson again claimed it should be excluded on the ground Nicole's state of mind was irrelevant. Goldman's memorandum replied the statements in the telephone call "explain Nicole's conduct in ending the relationship with defendant and in rejecting him again on June 12, the night of the murders," or were "admissible as circumstantial evidence of Nicole's state of mind. Each statement provides highly probative evidence of Nicole's fear, and helps explain her conduct in rejecting defendant and not wanting anything to do with him." In arguing the motion Goldman's counsel contended, "Our theory of the case, Your Honor, as you probably know, is that the . . . primary motivation for the crime was retaliation . . . from Ms. Brown's rejection of Mr. Simpson, the termination of the relationship and the rejection, specifically on June 12, as well, after the recital. And her state of mind about the relationship, the state of the relationship, her extreme fear of the defendant, as demonstrated by the phone call [to] Ms. Ney. It is probative of the fact that . . . she would

not want to be with him and would want to stay as far away from him as possible. [It very much] goes to her rejection of him." He argued the evidence impeached Simpson's position that Simpson had put the relationship behind him. He contended the evidence "really goes to the heart of the motive of the case, as to what's going on in the relationship in these few days before the murders. As the court in *Zack* said, antagonism, hostility, enmity in the relationship is highly probative and always relevant." The court agreed with plaintiffs' argument that the evidence was admissible for the limited purpose offered. Earlier the court had similarly admitted the diary entries. The court agreed with plaintiffs' contention the diary entries showed Nicole's state of mind as relevant to the motive issue.

Later when Goldman's counsel sought to cross-examine Simpson about the letter, Goldman's counsel asserted the letter came within the state of mind exception to the hearsay rule; Simpson's counsel again argued Nicole's state of mind was not in issue. The court concluded, "I'm satisfied that the decedent's state of mind has been put into issue insofar as it is the defendant's contention that the relationship was a loving relationship and that the defendant had no basis in that relationship which would cause him to commit the acts resulting in the deaths of the decedents. So I think that's clearly an issue."

Based on the particular circumstances and plaintiffs' theory of the case, the trial court reasonably concluded that Nicole's state of mind was in issue, and that evidence offered for the limited purpose of showing her state of mind was relevant and admissible. According to plaintiffs' theory of the case, Nicole, after a long stormy sometimes violent relationship with Simpson and efforts to reconcile, decided in May of 1994 finally to end the relationship; the final few weeks were tense; Simpson reacted negatively; finally, on the night of the killings, when Simpson was excluded from the family gathering he flew into a rage and killed Nicole, along with Ronald, an unanticipated bystander. The proffered evidence explained how Nicole was feeling about Simpson, tended to explain her conduct in rebuffing Simpson, and this in turn logically tended to show Simpson's motive to murder her. It was not irrelevant that: Nicole had cited prior beatings as a reason "why we split"; Nicole "never loved [Simpson] since" the New Year's 1989 beating; Nicole felt they had "officially split" on May 22, 1994; and Nicole on June 7, 1994, felt frightened and confused about whether to go back with Simpson, but decided not to. These feelings tended to explain her conduct on the days leading up to the killings, including the last day, when Simpson's motive was claimed to have arisen.

Simpson contends that because he denied being the perpetrator, *the defense* did nothing to put into issue Nicole's state of mind or conduct

immediately before the killings. This does not show the evidence was irrelevant. Even without an opening statement by Simpson's counsel or testimony by Simpson, plaintiffs were entitled to present evidence tending to establish motive. Without persuasive evidence from plaintiffs regarding motive, the jurors might believe there was nothing in the relationship between Simpson and Nicole which would precipitate a murder. (See *People v. Zack, supra*, 184 Cal.App.3d 409, 415 [prior assaults on wife admissible, husband "was not entitled to have the jury determine his guilt or innocence on a false presentation that his and the victim's relationship and their parting were peaceful and friendly"]; *People v. Linkenauger, supra*, 32 Cal.App.4th 1603, 1615 [same].)

This case, therefore, is not like the cases cited by Simpson where the court found there was no legitimate disputed issue concerning the hearsay declarant's state of mind. (Simpson cites *People v. Ireland* (1969) 70 Cal.2d 522, 529-532 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323] [victim's statement " 'I know he's going to kill me' " was not admissible to show victim's state of mind or conduct preceding death where it was undisputed at trial that defendant killed her while she was lying on a couch and his defense went to his mental state]; *People v. Arcega* (1982) 32 Cal.3d 504, 526-529 [186 Cal.Rptr. 94, 651 P.2d 338] [victim's statement that defendant " 'was going to hit her, to beat her up' " was not admissible to show victim's state of mind or conduct preceding death where defendant admitted killing the victim while she was asleep and argued only lack of premeditation; defense raised no issue that the victim's conduct immediately preceding death in any way provoked or mitigated the homicide]; *People v. Armendariz* (1984) 37 Cal.3d 573, 584-587 [209 Cal.Rptr. 664, 693 P.2d 243] [victim's statement, 17 months before the killing, indicating fear of the defendant was not admissible to show victim's state of mind on the night of the murder, where the defense identified a third person as the killer and raised no issue about the victim's attitude toward defendant or any issue that the killing was accidental or justifiable]; *People v. Ruiz* (1988) 44 Cal.3d 589, 607-610 [244 Cal.Rptr. 200, 749 P.2d 854] [victims' statements of fear of defendant were not admissible to show their states of mind; victims 1 and 2 were murdered in their sleep and there was no issue as to their conduct prior to the killings; victim 3's statement did not support prosecution theory of faltering marriage as motive for killing; but error harmless in light of limiting instruction]; and *People v. Noguera* (1992) 4 Cal.4th 599, 621-622 [15 Cal.Rptr.2d 400, 842 P.2d 1160] [victim's statement of fear and hatred of defendant was not admissible to show victim's state of mind, where her conduct and state of mind were not relevant to any part of the People's case nor did the defense raise any issue of her state of mind or behavior before she was murdered, the entire defense being alibi; but error harmless in light of limiting instruction].)

Here, plaintiffs presented specific theories why Nicole's state of mind about her relationship to Simpson was relevant to Simpson's reasons for killing her.

*Other Points*

Simpson raises several other points about the admission of this evidence, all without merit.

Simpson points out that the state of mind exception to the hearsay rule "does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed." (Evid. Code, § 1250, subd. (b).) This point is irrelevant because the evidence was admitted solely for the limited purpose of showing Nicole's state of mind, not "to prove the fact remembered or believed."

■ Simpson contends the statements in the call to the battered women's shelter which tended to identify the caller as Nicole (the caller stated her name was Nicole, she was Caucasian, she was in her 30's, she had been married eight years but was divorced, she had two children under 10, she was living in West Los Angeles, and her ex-husband was famous) were themselves inadmissible hearsay. They were not. They were not admitted "to prove the truth of the matter stated," because there was no material disputed issue in the case concerning Nicole's biographical history. These statements were introduced only as circumstantial evidence tending to identify the caller. They were properly admissible for this nonhearsay circumstantial evidence purpose. (*People v. Herman* (1920) 49 Cal.App. 592, 595-596 [193 P. 868]; *People v. McGaughran* (1961) 197 Cal.App.2d 6, 16 [17 Cal.Rptr. 121]; *People v. Hess* (1970) 10 Cal.App.3d 1071, 1078-1079 [90 Cal.Rptr. 268, 43 A.L.R.3d 643]; *Dege v. United States* (9th Cir. 1962) 308 F.2d 534, 535-536.)

Simpson contends that even if his hearsay and relevance objections lacked merit, the trial court nevertheless should have excluded this relevant evidence as unduly prejudicial, pursuant to Evidence Code section 352. (Fn. 2, *ante*.) ■ It is for the trial court, in its discretion, to determine whether the probative value of relevant evidence is outweighed by a substantial danger of undue prejudice. The appellate court may not interfere with the trial court's determination to admit the evidence, unless the trial court's determination was beyond the bounds of reason and resulted in a manifest miscarriage of justice. (*People v. Waidla* (2000) 22 Cal.4th 690, 724 [94 Cal.Rptr.2d 396, 996 P.2d 46]; *People v. Dyer* (1988) 45 Cal.3d 26, 73 [246 Cal.Rptr. 209, 753 P.2d 1]; *People v. Yovanov* (1999) 69 Cal.App.4th 392,

406 [81 Cal.Rptr.2d 586].) "Prejudic[ial]" in Evidence Code section 352 does not mean "damaging" to a party's case, it means evoking an emotional response that has very little to do with the issue on which the evidence is offered. (*People v. Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].) Evidence which has probative value must be excluded under section 352 only if it is "undu[ly]" prejudicial despite its legitimate probative value. (*People v. Waidla, supra*, 22 Cal.4th at p. 724 [if it "poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' "].)

The trial court did not manifestly abuse its discretion in the circumstances here. As we have noted, the nature of the relationship and Nicole's feelings about Simpson, especially in the final weeks, were highly relevant to plaintiffs' theory of the case that Simpson killed Nicole in a rage after she finally ended the relationship and began excluding him from family activities. As we concluded in the discussion of the first issue, evidence of prior violence between Simpson and Nicole was properly admissible. Five such incidents were properly proved either by direct testimony of third party eyewitnesses or by Nicole's spontaneous statements to officers at the time. The killings themselves were violent and suggestive of rage. Although the telephone call, letter, and diary referred to some of these prior incidents and *suggested* there were other beatings, threats, or recent stalking, they were not admitted for the truth of the matter. They were not unduly inflammatory in light of all the other admissible evidence of violence. (*People v. Yovanov, supra*, 69 Cal.App.4th at p. 406.)

The trial court instructed the jury that this evidence was limited to showing Nicole's state of mind about the relationship.[6] Simpson contends the evidence should have been excluded entirely on the ground that despite

---

[6]With respect to the telephone call to the battered women's shelter, the court instructed the jury: "The testimony of Nancy Ney of a telephone call from Nicole was received into evidence for the limited purpose—for a limited purpose, and cannot be considered by the jury for any other purpose. It has been contended variously that Nicole Brown Simpson was trying to get back together with Mr. Simpson; that she was fearful of him, or that [she] did not want to reconcile with him; or that she had a state of mind that was one way or another at different times. The testimony of Nancy Ney, of the Sojourn House, about the telephone call was offered by the plaintiff to show Nicole's state of mind regarding the relationship at the time the call was made, and to explain her conduct as it may relate to Mr. Simpson at the recital the night of her death. This testimony is received only to show her state of mind, and to explain her conduct. The jury must not consider the substance of her statement to Nancy as evidence of any event or whether such event occurred."

With respect to the letter to Simpson, the court instructed the jury: "You're instructed that the letter of Nicole Brown Simpson directed to defendant Simpson, that is Exhibit 732, was received into evidence for the limited purpose of allowing plaintiffs to offer evidence of the state of mind of Nicole Brown Simpson regarding the relationship between Nicole Brown Simpson and defendant Simpson, and it cannot be considered by you as proof of any truth of

this instruction, there was too much danger the jury would consider the statements for the truth of the matters asserted. Simpson attempts to distill from certain cases a rule that it is impossible for a jury to separate the state of mind of the declarant from the truth of the facts contained in declarations admitted into evidence solely to show state of mind. He cites *People v. Hamilton* (1961) 55 Cal.2d 881, 895-896 [13 Cal.Rptr. 649, 362 P.2d 473], *People v. Coleman* (1985) 38 Cal.3d 69, 81-86 [211 Cal.Rptr. 102, 695 P.2d 189], and *Shepard v. United States* (1933) 290 U.S. 96, 104-106 [54 S.Ct. 22, 25-26, 78 L.Ed. 196].

There is no such general rule. In *People v. Ortiz, supra,* 38 Cal.App.4th 377, 385-394, the Court of Appeal reviewed these authorities. It pointed out that *Hamilton*, a 1961 case, was expressly repudiated in the subsequent adoption of the Evidence Code. "The Law Revision Commission Comments accompanying the new code sections make clear the code's repudiation of the *Hamilton* rule." (*Ortiz, supra,* at p. 387.) When the declarant's state of mind is relevant and the statements of threats or brutal conduct are circumstantial evidence of that state of mind, the evidence is admissible so far as a hearsay objection is concerned. " 'Evidence Code Section 352 provides the judge with ample power to exclude evidence of this sort where its prejudicial effect outweighs its probative value. But, under Section 352, the judge must weigh the need for the evidence against the danger of its misuse in each case. The Evidence Code does not freeze the courts to the arbitrary and contradictory standards mentioned in the Hamilton case for determining when prejudicial effect outweighs probative value.' " (*Id.* at pp. 387-388.) "[N]ow that section 352 codifies a safeguard for the evaluation of such evidence before it can be admitted, the trial court has a mechanism for considering the potential for misuse on the unique facts and statements in each case. Where the statement is offered as relevant circumstantial evidence of the victim's state of mind, the court may consider [a variety of circumstances, *one* of which is whether the trial court believes, based on the particular facts, that the jury cannot] follow the limiting instruction." (*Id.* at pp. 391-392.) The general rule is that juries are presumed to follow a trial court's limiting instruction. (*People v. Waidla, supra,* 22 Cal.4th 690, 725.) This is "[t]he crucial assumption underlying our constitutional system of trial by jury" (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84]), "the almost invariable assumption of the law." (*Richardson v. Marsh* (1987) 481 U.S. 200, 206, 207 [107 S.Ct. 1702, 1707,

any matter that is self-contained or alleged in the letter; in other words, the substance of the letter. The letter cannot be used as evidence to establish anything in the letter, the truth of anything in the letter. It's received only for the purpose of allowing the plaintiffs to offer evidence as to what the state of mind of Nicole Brown Simpson was with respect to her relationshp with Mr. Simpson during that period of time."

95 L.Ed.2d 176].) Whether it would be impossible for a jury to follow limiting instructions is determined by the circumstances of each case, primarily in the trial court's discretion under Evidence Code section 352. (*People v. Ortiz, supra*, 38 Cal.App.4th at pp. 386, 388, 394.) Even in two of the cases cited by Simpson where declarations of the victim's fear of the defendant should not have been admitted at all, because the victim's state of mind was not genuinely in issue, the Supreme Court held the error harmless because the trial court had instructed the jury the evidence could be considered only for that limited purpose. (*People v. Ruiz, supra*, 44 Cal.3d 589, 609-610; *People v. Noguera, supra*, 4 Cal.4th 599, 622-623.) For the same reasons we have discussed why the evidence was not unduly inflammatory, the trial court could reasonably conclude the jury was capable of following the limiting instruction.

■ Finally, Simpson contends with respect to the telephone call to the battered women's shelter that the record does not show the trial court actually exercised its discretion pursuant to Evidence Code section 352 and actually weighed the probative value against the potential for undue prejudice. If a proper objection under section 352 is raised, the record must affirmatively demonstrate that the trial court did in fact weigh prejudice against probative value. The trial court need not make findings or expressly recite its weighing process, or even expressly recite that it has weighed the factors, so long as the record as a whole shows the court understood and undertook its obligation to perform the weighing function. (*People v. Waidla, supra*, 22 Cal.4th 690, 724, fn. 6; *People v. Crittenden* (1994) 9 Cal.4th 83, 135 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Triplett* (1993) 16 Cal.App.4th 624, 627-629 [20 Cal.Rptr.2d 225].)

Simpson's pretrial motions in limine addressed the admissibility of Nicole's out-of-court statements in general, but not the telephone call to the battered women's shelter in particular. In ruling on those motions, the trial court stated that it assumed the nature of the relationship between Simpson and Nicole would be relevant. The court stated that it would rule on particular specific statements when they were offered during the trial, and would at that time "make a weighing under *People vs. Ortiz*, 38 Cal.App.4th 377, under 352 of the Evidence Code. The Court is mindful of *People vs. Coleman*, 38 Cal.3d[] 69, regarding the high threshold of probative value outweighing its prejudicial effect . . . ." When the issue of the call to the battered women's shelter came up later during trial, the court received written memoranda from plaintiffs and defendant. Defendant's papers addressed primarily the hearsay/relevance issue of whether Nicole's state of mind was genuinely in issue. The written motion cursorily suggested that the evidence was more prejudicial than probative and should be excluded under

Evidence Code section 352. The court's minute order states it "read and considered all papers filed on the issue." The court invited oral argument on the motion. Both counsel orally addressed only the state of mind hearsay issue. At the conclusion the court stated, "Well, the Court has reread People versus Ortiz, 38 Cal.Ap[p].4th 377 . . . . I think on that basis, on the basis on which the plaintiff has represented that he is offering the testimony, the Court finds that . . . there is an exception, in view of the Evidence Code, for those purposes, and the objection is overruled."

Contrary to Simpson's contention, this record shows that the trial court engaged in the Evidence Code section 352 weighing process. *People v. Ortiz, supra*, 38 Cal.App.4th at pages 385-397, extensively discussed Evidence Code section 352 in the context of different types of statements made by the deceased murder victim. The trial court's remark here that it had reread *Ortiz* in connection with this motion, the same case it had cited earlier when it expressly referred to the section 352 weighing process, shows the trial court engaged in that process as to the battered women's shelter call. (*In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1845 [40 Cal.Rptr.2d 85].)

### REFERENCE TO LIE DETECTOR

Simpson contends the trial court erred in failing to sustain an initial objection, and failing to grant a motion for mistrial, when Goldman's counsel cross-examined Simpson about allegedly taking and failing a lie detector test. We conclude that the trial court's admonitions to the jury to disregard any insinuations in counsel's questions cured any possible prejudice from the inquiry.

### *Factual Background*

During his opening statement to the jury, *Simpson's* counsel described how Simpson cooperated with authorities during the early investigation of the murders. He stated, "Mr. Simpson, through his attorneys, offered the services of some forensic scientists . . . . It was refused. *He offered to take a polygraph. It was refused.*" (Italics added.) Plaintiffs' counsel did not object at the time that this was an improper statement because an offer to take a polygraph test is not admissible evidence.

During cross-examination of Simpson by Goldman's counsel, Simpson indicated that when police asked him about taking a polygraph test he wanted to wait because he was tired, he was having "weird thoughts," and he wanted to find out more about how a polygraph test works.

Counsel then asked: "Q. And you did take the test, and you failed it, didn't you? [Simpson's counsel:] Objection. . . . Q. [Goldman's counsel:] You

failed it, true? A. No. [Simpson's counsel:] Objection. A. That's not correct. Q. [Goldman's counsel:] You got a minus 22? [Simpson's counsel:] Your Honor, I'm going to object to this."

The objection was then discussed at the bench. Goldman's counsel argued the opening statement by Simpson's counsel, that Simpson offered to take a lie detector test and it was refused, implied that Simpson would have taken and successfully passed one, and thereby "opened the door" for plaintiffs' counsel to rebut that suggestion by inquiring whether Simpson took one and failed it. Simpson's counsel argued the questioning was improper because (1) it was not factually correct that Simpson took a lie detector test, or failed it, (2) the results of Simpson's consultation with a polygraph examiner were protected by attorney-client privilege, and (3) Simpson's offer to take one, which the police refused, did not open the door to inquiry that he had taken and failed one. Goldman's counsel replied he was basing his inquiry on facts related in a book which had been published and that any attorney-client privilege was waived by the publication. The trial court at that point overruled the objection.

Goldman's counsel then cross-examined Simpson further. Simpson testified he went to the office of an expert Edward Gelb only for the purpose of understanding how a polygraph worked, and after he was finished he told his attorneys he was willing to take a lie detector test. Simpson denied that the consultation with Gelb was actually a lie detector test, rather it was only a demonstration. He testified, "As far as I know, I didn't take a polygraph test." When Goldman's counsel asked whether Simpson scored a minus 22, indicating extreme deception, the court sustained an objection.

Later in the trial, the court decided it should admonish the jury in connection with this line of questioning. The court drafted and discussed with counsel its proposed instruction. Simpson's counsel argued the instruction was not sufficient to cure the allegedly false implication that Simpson took and failed a lie detector test. Simpson's counsel moved instead for a mistrial, which the court denied. Goldman's counsel reiterated his claim that his questioning was proper because Simpson's counsel had opened the door in his opening statement. The trial court rejected that argument also, noting that Goldman's counsel had not objected to the opening statement. Goldman's counsel requested the court modify the instruction to make it "more balanced." The trial court also rejected this suggestion, then proceeded to deliver its instruction to the jury as follows: "Ladies and gentlemen, the Court at this time will give you specific instructions regarding the plaintiffs' examination of Mr. Simpson which was just completed concerning lie detectors. I want you to listen very closely. All communications between an

attorney and his client are absolutely privileged. This means that such communications cannot be used by anyone for any purpose except with the permission of the client. Mr. Simpson cannot be asked any questions about any communications with his attorneys. Furthermore, there is no evidence that Mr. Simpson consented to the publication of any of his communications with his attorney. You will recall, Mr. Simpson's attorney, Mr. Baker, in his opening statement to you, spoke on the subject of a lie-detector test. By this opening statement, Mr. Simpson opened the subject of lie detectors to examination by the plaintiff. This, however, did not open the subject of any communication on this matter between Mr. Simpson and his attorneys, or persons acting for the attorneys for any purpose. In this trial, Mr. Petrocelli questioned Mr. Simpson whether he took a lie-detector test, any score and meaning thereof. I instruct you that his questions do not and cannot establish that Mr. Simpson took a . . . lie-detector test, a score and meaning thereof. Statements of counsel, that is, the statements or questions of Mr. Petrocelli, are not evidence and may not be considered by you for any purpose. The references or statements regarding a lie-detector test and Mr. Petrocelli's questions are not evidence unless they were adopted by Mr. Simpson in his answers. A question by itself is not evidence. You may consider questions only to the extent the content of the questions are adopted by the answer. Mr. Simpson's answer to the question of whether he took a lie-detector test was that he was given an explanation of how the test worked and that he did not take the test. There is no other evidence before you that Mr. Simpson took a lie-detector test, and the plaintiff is bound by Mr. Simpson's response. Likewise, when Mr. Petrocelli asked Mr. Simpson whether he knew what the score on the test was, whether it was a minus 22, or whether it indicated extreme deception, these were questions by an attorney and do not constitute evidence. Mr. Simpson denied any test score or any knowledge of what test scores meant, and there is no evidence before you of any test score or what a score means. There was only Mr. Petrocelli's questions which were not adopted by an answer. Plaintiff is bound by Mr. Simpson's response. Therefore, there is no evidence before you that Mr. Simpson took a lie-detector test, no evidence about any score on such a test, nor any evidence of what any score means. You must totally disregard the questions about taking lie-detector tests, test scores and their meanings, and treat the subject as though you had never heard of it. Do all of the jurors understand these instructions? [The jurors nodded affirmatively, and when asked if any had questions, nodded negatively.]"

## Discussion

■ In the absence of a stipulation between the parties, the results of a polygraph examination, as well as the fact of an offer to take, a refusal to

take, or the taking of a polygraph examination, are inadmissible as evidence in California criminal and civil proceedings. (Evid. Code, § 351.1; *People v. Morris* (1991) 53 Cal.3d 152, 193 [279 Cal.Rptr. 720, 807 P.2d 949]; *Arden v. State Bar* (1987) 43 Cal.3d 713, 723 [239 Cal.Rptr. 68, 739 P.2d 1236, 79 A.L.R.4th 559]; *People v. Thornton* (1974) 11 Cal.3d 738, 763-764 [114 Cal.Rptr. 467, 523 P.2d 267].) ▇ But the present case is not one in which the results of a polygraph test were admitted into evidence. There were only statements by counsel, which the trial court appropriately instructed the jury are not evidence. The trial court's instructions prevented any prejudice to Simpson from insinuations in counsel's questions. (*People v. Parrella* (1958) 158 Cal.App.2d 140, 147 [322 P.2d 83]; see *People v. Morris, supra,* 53 Cal.3d at p. 194; *People v. Paul* (1978) 78 Cal.App.3d 32, 40 [144 Cal.Rptr. 431]; *People v. Babcock* (1963) 223 Cal.App.2d 813, 817-818 [36 Cal.Rptr. 178].)

This case is strikingly similar to *People v. Parrella, supra,* 158 Cal.App.2d 140. There the defendant on direct examination by his own attorney stated that while in custody he volunteered to take, and did take, a lie detector test. The prosecutor did not object to this testimony on the ground the defendant's willingness to take a lie detector test was inadmissible; rather, contending that defendant had opened the door, the prosecutor asked the defendant on cross-examination for the results of the test. Defense counsel objected that this question was improper because the results of a lie detector test are not admissible evidence. The trial court ruled that the prosecutor's question went too far, and instructed the jury that " 'the question of lie detector has no place in the case. It has been determined that lie detectors are not admissible in evidence in a trial of a case.' " (*Id.* at pp. 144-145.) When the prosecutor mentioned it again during final argument the trial court again admonished the jury not to consider any mention of the test. (*Id.* at p. 146.) The appellate court affirmed. It held the defendant's objectionable testimony to which the prosecutor failed to object did not open the door for the prosecutor to show the results of the test, but the prosecutor's questions were not prejudicial to the defendant in light of the trial court's instructions. (*Id.* at p. 147.)

Here, the only *evidence* regarding a lie detector test elicited by the cross-examination was Simpson's testimony that he did *not* take and fail one, and the trial court specifically instructed the jury that plaintiffs were bound by that answer. Simpson's claim that the instructions were ineffective to cure contrary *insinuations* in counsel's questioning lacks merit under the circumstances. (*People v. Morris, supra,* 53 Cal.3d 152, 194 [jury is presumed to have followed instructions]; *People v. Paul, supra,* 78 Cal.App.3d 32, 40 [the testimony concerning the actual results of the lie detector test, although stricken, was favorable to the defendant, that he had passed it].) The cases

cited by Simpson involved far more extensive or egregious emphasis on the results of the test. (Simpson cites *People v. Wochnick* (1950) 98 Cal.App.2d 124, 128 [219 P.2d 70] [police officer extensively testified about the lie detector test he administered to the defendant and having asked defendant at the conclusion of it whether defendant had any explanation for the responses of the machine; held, despite a limiting instruction that this testimony was admitted only as background to the officer's accusatory statement and the defendant's answer, "the evidence of the partial results of the lie detector test with respect to defendant's reaction upon being shown the murder weapon was indelibly implanted in the minds of the jurors and could not but have had a prejudicial effect"]; *People v. Aragon* (1957) 154 Cal.App.2d 646, 658-659 [316 P.2d 370] [prosecutor repeatedly suggested in arguments to jury that defendant's interrogator had given defendant a lie detector test he had not passed; held, "it would be hard to believe that the jury here considered the statements [of the interrogator] solely as accusatory statements"; "[o]bviously" the references to the lie detector test were highly prejudicial]; and *People v. Schiers* (1971) 19 Cal.App.3d 102, 109-114 [96 Cal.Rptr. 330] [police officer repeatedly testified he told the defendant the lie detector indicated he was lying; this was error deliberately committed by the prosecutor at a crucial point in the case; trial court instructed jury to disregard the references to a lie detector; held, under the circumstances the instruction to disregard was " 'no antidote for the poison which had been injected into the minds of the jurors' "].)

## EXCLUSION OF PRIOR TESTIMONY OF MARK FUHRMAN

Mark Fuhrman, a police officer who had been a prosecution witness at Simpson's prior criminal trial, was unavailable as a witness for this trial. Simpson desired to introduce into evidence, in the present civil trial, portions of prior testimony given by Fuhrman in the criminal trial. Simpson claimed that Evidence Code section 1292 authorized the admission of Fuhrman's prior testimony. The trial court ruled that section 1292 did not apply, therefore Fuhrman's prior testimony was not admissible.

On appeal, Simpson contends the trial court erred. He also contends that plaintiffs waived objection to the introduction of Fuhrman's prior testimony by failing to object before the jury voir dire.

There is no merit to these contentions. Evidence Code section 1292 did not permit introduction of Fuhrman's prior testimony, because plaintiffs had no opportunity to cross-examine Fuhrman, and the prior direct examination of Fuhrman by the prosecution in the criminal case was not a substitute for plaintiffs' right to cross-examine in the present case. Furthermore, plaintiffs' objection was not too late.

## Evidence Code Section 1292

Evidence Code section 1292, subdivision (a) provides: "Evidence of former testimony is not made inadmissible by the hearsay rule if: [¶] (1) The declarant is unavailable as a witness; [¶] (2) The former testimony is offered in a civil action; and [¶] (3) The issue is such that the party to the action or proceeding in which the former testimony was given had the right and opportunity to *cross-examine* the declarant with an interest and motive similar to that which the party against whom the testimony is offered has at the hearing." (Italics added.)

This section "provides a hearsay exception for former testimony given at the former proceeding by a person who is now unavailable as a witness when such former testimony is offered against a person who was not a party to the former proceeding but whose motive for cross-examination is similar to that of a person who had the right and opportunity to cross-examine the declarant when the former testimony was given. . . . [¶] . . . The trustworthiness of the former testimony is sufficiently guaranteed because the former *adverse* party had the right and opportunity to *cross-examine* the declarant with an interest and motive similar to that of the present adverse party. Although the party against whom the former testimony is offered did not himself have an opportunity to cross-examine the witness on the former occasion, it can be generally assumed that most prior cross-examination is adequate if the same stakes are involved." (Assem. Com. on Judiciary, com. on Assem. Bill No. 333 (1965 Reg. Sess.) reprinted at 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1292, p. 392, italics added; 7 Cal. Law Revision Com. Rep. (1965) p. 253.)[7]

As these terms apply here, the parties to the prior proceeding were Simpson, as the criminal defendant, and the People of the State of California, represented by the District Attorney of Los Angeles County, as the criminal prosecutor. The former testimony of Fuhrman in the criminal trial was offered in the present civil trial by Simpson, the civil defendant, against Sharon Rufo, Fredric Goldman, and the representatives of the estates of Ronald and Nicole, the present civil plaintiffs, none of whom was a party to the prior criminal proceeding.

The trial court reasoned that the prosecution in the prior criminal trial did not "cross-examine" Fuhrman at all, but rather directly examined him as a prosecution witness. It stated: "The precise language of section 1292 states

---

[7]The Law Revision Commission and Legislative Committee comments to the Evidence Code are particularly valuable in construing the code. (1 Witkin, Cal. Evidence, *supra*, Introduction, § 16, pp. 25-26.)

'cross-examine.' Section *1291* of the Evidence Code allows former testimony to be used against the [same] party that offered it in the prior proceedings, or that party's successor in interest[8] . . . . The legislative history notes the distinct language of both section[s] 1291 and 1292, but the legislature in section 1292 made no provision for admission [against the present party] of . . . prior testimony *offered by* the [different] party in the prior proceeding . . . . [¶] The term 'cross-examination' is a defined term in the Evidence Code. Section 761 defines it as 'the examination of a witness by a party other than the direct examiner.' The legislature is presumed to know what i[s] included in its own enactments, particularly when it defines the terms it used in that same enactment. [¶] Federal Rule of Evidence section 804(b)(1) allows prior testimony where there was opportunity to 'develop the testimony [by] direct, cross, or [re-]direct examination,' . . . which distinguishes its scope from Evidence Code section 1292." (Italics added.)

The trial court added, "Plaintiff has no interest in offering Mr. Fuhrman as a witness. Plaintiff has established the circumstances of the discovery and collection of the Rockingham glove by testimony of percipient witnesses, and independent of Mr. Fuhrman. Defendant has no apparent need for Mr. Fuhrman's testimony other than to show his alleged bias against defendant, and is not offering Mr. Fuhrman's testimony for any evidentiary purpose other than to discredit him as a witness."

The trial court's ruling was consistent with both the letter and spirit of Evidence Code section 1292. As the court noted, the official comments draw distinctions between sections 1291 and 1292. According to the comments, section 1291, subdivision (a)(1) allows admission against a party in the present proceeding of prior testimony that the *same party* previously offered *on its own behalf* in the prior proceeding by way of *direct and redirect* examination. Section 1292, subdivision (a) allows admission against a party in the present proceeding, who was not a party to the prior proceeding, of prior testimony that a different party having a similar interest and motive *adverse* to the testimony tested for truthfulness by *cross*-examination. Section 1291 does not apply, because plaintiffs were not parties to the prior

---

[8]Evidence Code section 1291, to which the court referred, provides that "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] (1) The former testimony is offered against *a person who offered it in evidence in his own behalf* on the former occasion or against the successor in interest of such person . . . ." (Italics added.) The comment to this section explains that it "provides for the admission of former testimony if it is offered against the party who offered it in the previous proceeding. Since the witness is no longer available to testify, *the party's previous direct and redirect examination* should be considered an adequate substitute for his present right to cross-examine the declarant." (Assem. Com. on Judiciary, com. on Assem. Bill No. 333 (1965 Reg. Sess.) reprinted at 29B pt. 4 West's Ann. Evid. Code, *supra*, foll. § 1291, p. 372, italics added; 7 Cal. Law Revision Com. Rep., *supra*, p. 251.)

criminal proceeding nor are they successors in interest to the People. Section 1292 does not apply, because the People in the prior criminal proceeding were not adverse to and did not cross-examine in the prior testimony of Fuhrman. The trial court correctly excluded the prior testimony because section 1292 makes no provision for it in the circumstances here.[9]

Because there was no prior adverse cross-examination within the meaning of Evidence Code section 1292, it is irrelevant whether, as Simpson claims, · the People in the criminal proceeding and plaintiffs in this proceeding had the same general interest in attempting to prove that Simpson committed the crimes. But the trial court's additional comments point out the incongruities in Simpson's position and why exclusion was also consistent with the spirit of section 1292. Similarity of interests and motive depends on practical considerations; not merely the similar position of the parties in the two cases. (*Gatton v. A.P. Green Services, Inc.* (1998) 64 Cal.App.4th 688, 692 [75 Cal.Rptr.2d 523].) Plaintiffs were not relying on Fuhrman in their case; Simpson's offer of prior testimony of Fuhrman attempted, in effect, to compel plaintiffs involuntarily to rely upon Fuhrman so that Simpson could then impeach Fuhrman. Unless the strict conditions of section 1292 are satisfied, the party in the second proceeding (plaintiffs) should not be bound by the manner in which the other party in the prior proceeding (the prosecution) presented its case. (64 Cal.App.4th at p. 693.) Furthermore, the basic theory supporting this hearsay exception is that former testimony subjected to cross-examination to test its credibility is reliable and trustworthy. (1 Witkin, Cal. Evidence, *supra*, Hearsay, § 255, p. 973.) Simpson did not desire the prior testimony to prove that Fuhrman recovered evidence, but rather to suggest by proposed impeaching evidence that he planted it.

### Timeliness of Objection

The trial court's ruling that Fuhrman's prior testimony was inadmissible followed upon its earlier ruling on the motion of Goldman's counsel to preclude Simpson's counsel from referring to it in his pretrial opening statement to the jury.

At the time of the ruling precluding Simpson's counsel from referring to Fuhrman's prior testimony in the opening statement, October 1996, Simpson's counsel complained that the motion was too late. Simpson's counsel

---

[9]*Moore v. American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 628-629 [197 Cal.Rptr. 878], cited by Simpson as authority for more broadly construing Evidence Code section 1292, does not support him. There the court held that the requirement of prior cross-examination by a party having a similar interest and motive was satisfied by the cross-examination of a claimant by a workers' compensation judge in an administrative proceeding. The court did not dispense with the cross-examination requirement; it only extended the concept of a party to include a workers' compensation judge.

argued that Goldman's counsel should have raised objection earlier, by way of a motion in limine in August 1996, prior to the voir dire of potential jurors. He contended that in the absence of an earlier motion in limine, counsel had extensively questioned potential jurors on the subject of Mark Fuhrman, and he contended Simpson would suffer prejudice if evidence from Fuhrman was not forthcoming. He argued Goldman's motion to preclude the reference in opening statement should be denied as untimely.

The trial court rejected these arguments. In its formal ruling on admissibility the trial court expressly addressed the timeliness of Goldman's objection as follows: "Plaintiff gave Defendant sufficient notice of his objection to the use of Fuhrman's prior testimony under Evidence Code section 1292 and [Fuhrman's] conviction of perjury prior to [the] opening statement. And the Court had reserved ruling on this issue pending further briefing. The fact that this issue was not raised prior to the deadline for motions in limine, it is excused by this Court, finding it excusable, in view of the unsettled status of Fuhrman's potential availability as a witness at the time because of [his] then pending criminal proceedings and plea of nolo contendere therein, and that the Defendant is not presently prejudiced because Defendant had ample time to prepare, since October 21, 1996, when this present motion was filed, it now being November 18."

On appeal Simpson contends, "Of course, the Plaintiffs were well aware as of the commencement of the trial that Fuhrman would not appear at the trial and that therefore, Simpson would have to rely exclusively on his former testimony at the criminal trial." This contention is contradicted by the trial court's findings. The court found, consistent with the record during the earlier pretrial proceedings, that as late as October 1996 there still existed the possibility Fuhrman would appear voluntarily and testify. ■ A ruling on a pretrial motion in limine is necessarily tentative because subsequent evidentiary developments may change the context. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1174 [36 Cal.Rptr.2d 235, 885 P.2d 1] [in limine ruling is necessarily tentative because trial court retains discretion to make a different ruling as the evidence unfolds]; *People v. Morris* (1991) 53 Cal.3d 152, 189-190 [279 Cal.Rptr. 720, 807 P.2d 949] [subsequent events in trial may change the context and require a renewed objection].) Ordinarily the opponent of evidence need not object until the evidence is introduced. A pretrial motion in limine is merely an *additional* protective device for the opponent of the evidence, to prevent the proponent from even mentioning potentially prejudicial evidence to the jury. (*Abbett Electric Corp. v. Sullwold* (1987) 193 Cal.App.3d 708, 715 [238 Cal.Rptr. 496].) Simpson's argument that the failure to make an earlier motion in limine waives raising the objection later in the trial turns that rule on its head. Simpson appears to rely

on a theory of equitable estoppel, but the record here does not support it. As the trial court found, plaintiffs did not mislead Simpson's counsel that they had no objection under Evidence Code section 1292. Simpson's counsel could not reasonably rely on plaintiff's mere failure to make a motion in limine at the early pretrial stage, before it was even determined whether Fuhrman might actually appear in court. Simpson did not suffer any significant prejudice from the supposed reliance, where only the voir dire was affected and the issue was resolved before opening statements were given. (Cf. *Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 219 [6 Cal.Rptr.2d 900].)

EXCLUSION OF EXPERT TESTIMONY ON LABORATORY VALIDATION STUDIES

Simpson contends the trial court erred in excluding certain portions of proposed testimony by an expert witness for the defense regarding DNA testing. We conclude the trial court properly excluded this evidence as irrelevant.

Prior to trial Goldman filed a motion in limine to exclude certain testimony by defense expert Dr. John Gerdes. Goldman expected Gerdes to offer to testify: that he reviewed certain validation studies performed at the Los Angeles Police Department Scientific Investigations Division (SID) between May 1993 and August 1994; that in his opinion these studies indicated a pattern of additional alleles showing up in the typing of reference samples pursuant to the DQ alpha dot blot system;[10] that in his opinion the presence of additional alleles in the results indicated something wrong, which could be due to various procedural errors, including contamination of the samples with extraneous human DNA; that in his opinion the validation data indicated a chronic and persistent contamination problem at SID during the period covered by the validation studies. Goldman argued that Gerdes did not find evidence of contamination in the samples from *this* case, only possible contamination in validation studies conducted on *non-casework* samples for the purpose of testing laboratory proficiency. He contended that in the absence of evidence of contamination in this case, the proposed expert opinion about contamination in validation studies offered only speculation of contamination in this case and should be excluded under Evidence Code section 352 because its minimal probative value was outweighed by a substantial danger of causing prejudice to plaintiffs, confusing the jury, and consuming undue time. (Fn. 2, *ante.*)

In opposition to the in limine motion, Simpson argued the motion was premature. He contended the court should delay deciding until all the

---

[10]An allele is a segment of DNA at a particular location on a chromosome. Alleles are inherited in pairs, one from the father and one from the mother.

plaintiffs' scientific evidence was in, so that the court could then understand the complex scientific context and implications of potential contamination.

The court denied Goldman's pretrial motion in limine. The court indicated that although Gerdes's proposed testimony did not relate to the samples in this case but only validation studies, it might prove to be relevant to the weight of the evidence.

Later during the trial, after the presentation of plaintiffs' scientific evidence, Goldman renewed his motion to exclude Gerdes's testimony about the validation studies. Goldman argued that two developments which had since occurred at the trial now made the proposed testimony altogether irrelevant. Goldman argued that in the opening statement to the jury by Simpson's counsel, "defendant has acknowledged that his contamination defense is premised not upon alleged contamination that took place during the DNA testing process performed by SID in the laboratory, but rather upon contamination allegedly occurring during the so-called 'sampling' procedure where portions of the evidence swatches to be tested were removed from bindles in the Evidence Processing Room."[11] Goldman asserted the reason Simpson had framed the contamination defense in this manner was that two other laboratories, the California Department of Justice and Cellmark, had reached the same results as SID on other sample swatches, thus "in order to account for the incriminating DOJ and Cellmark results, defendant must argue that the contamination occurred in the Evidence Processing Room, the only place where all of the evidence swatches could be affected." Goldman argued that "by framing the contamination defense as he has, defendant has now made clear that Dr. Gerdes' contamination theory has absolutely nothing whatsoever to do with this case. Dr. Gerdes studied DNA testing done by SID in connection with its validation of the DQ alpha process and as part of proficiency tests by the SID personnel to determine if they were appropriately running the DQ alpha tests. Dr. Gerdes' testimony does not and cannot have anything to do with the 'sampling' procedure followed by Collin Yamauchi on June 14, 1994. In fact, since the DQ alpha results that Dr. Gerdes examined were not actual case samples, but rather mock samples

---

[11]In the defense opening statement to the jury Simpson's counsel stated, "The evidence will be, ladies and gentlemen, that the day of [June] 14th [1994] Collin Yamauchi is processing OJ Simpson's reference blood. Now, you will hear from experts that you don't process reference blood first, you process reference blood last. And the reason you do that is because reference blood taken out of Mr. Simpson's arm is so rich in DNA, that if it spills, it can contaminate everything and ruin all of the evidence that you have there. And so on the 14th, Collin Yamauchi takes the top off of the vial of Mr. Simpson's blood and spills it. And spills it on his hand, on a Chem Wipe. And you will hear that that spill can contaminate every piece of evidence in this case. It is because they process the evidence in the same place, in the same location."

which had been prepared in the SID lab for testing purposes, no 'evidence sampling' procedure ever even took place in regard to the test samples that Dr. Gerdes reviewed." Besides, Goldman added, Yamauchi did not testify that he spilled Simpson's reference blood, as apparently anticipated by the defense opening statement, and Yamauchi changed gloves between handlings of each item of evidence. Goldman next argued a second independent reason that developed during trial why Gerdes's testimony should be excluded as irrelevant. Simpson's admissions in response to requests for admissions had been read to the jury. In those responses Simpson admitted the results of the DNA tests.[12] Thus, Goldman argued, "insofar as Dr. Gerdes' testimony purports to establish that the DNA test results are unreliable because they were affected by contamination within the SID laboratory during its DQ alpha testing, that argument is completely undercut by defendant's response to plaintiff's requests for admissions admitting the accuracy of these DQ alpha test results." Goldman concluded the proposed Gerdes testimony was either "irrelevant [or] unduly prejudicial under Evidence Code section 352."

In opposition to Goldman's motion, Simpson's counsel argued that Gerdes's opinion as to the validation studies "is relevant to the weight of the results in this case," and that Simpson's admissions meant only "those were the results they were going to testify about, not that they were the correct results." He added that Gerdes also would testify that in his opinion there was contamination in the results as to two items of evidence in this case.

The trial court ruled Gerdes could testify about contamination in test results relating to this case, but not the validation studies, basing its ruling "upon the reasons stated by the plaintiff."

Whereas at the time of the pretrial in limine motion it appeared the proposed testimony would be relevant to the weight of plaintiffs' scientific evidence, subsequent events showed the testimony would have no probative value in light of the way the case was actually being tried. (*Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 337-338 [145 Cal.Rptr. 47].) Alternatively, the court could reasonably conclude the probative value was minimal and in its discretion exclude the evidence under Evidence Code section 352. (*Hyatt, supra,* 79 Cal.App.3d at p. 338, fn. 7; see *People v. Babbitt* (1988) 45 Cal.3d 660, 681-682 [248 Cal.Rptr. 69, 755 P.2d 253].)

---

[12]The typical pattern of the requests for admissions was: "Admit that the blood contained in the item identified [as evidence item x] had an HLA DQ Alpha blood type 1.1, 1.2." The responses were: "Admit." The responses had a preface: "As to the following requests for admissions [the] defendant adopts the plaintiffs' definition as communicated to the defendant a[t] that point in time when an item was tested by an outside laboratory as opposed to the time of collection or any other point in time."

## JUROR MISCONDUCT

After the jury had been deliberating for two and one-half days during the liability phase of the trial, the trial court received a letter stating that the daughter of Juror No. 7 had worked for many years as a legal secretary in the Los Angeles County District Attorney's Office and had a social relationship with Christopher Darden, one of the prosecutors in the prior criminal trial. In the initial jury questionnaire, Juror No. 7 had answered "No" to the question, "Have you or any close friends or relatives ever been employed by, or otherwise affiliated with any of the law enforcement agencies listed above [which included district attorney] or any other law enforcement organization?" Upon questioning by the court the juror stated she had inadvertently answered "no" while rushing to complete the questionnaire, and that she should have answered yes and disclosed her daughter's employer. The juror stated she had not met Christopher Darden.

Simpson moved for a mistrial on the ground the juror had concealed material information on voir dire that if disclosed would have led the defense to peremptorily excuse her. The trial court denied a mistrial but removed Juror No. 7 from the jury on the ground her answer to a clear and unequivocal question on the questionnaire omitted material information. The court then replaced her with an alternate and instructed the jurors to disregard prior deliberations and begin their deliberations anew. Thus the jury which rendered the verdict, after three days of new deliberations, did not include the offending Juror No. 7.

▮▮▮ Simpson contends the court should have granted a mistrial instead of simply removing the juror. He bases this argument on nothing more than the legal rule that a juror's concealment of material information on voir dire is serious misconduct which raises a "presumption of prejudice." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 416 [185 Cal.Rptr. 654, 650 P.2d 1171]; *In re Hitchings* (1993) 6 Cal.4th 97, 119 [24 Cal.Rptr.2d 74, 860 P.2d 466]; *People v. Blackwell* (1987) 191 Cal.App.3d 925, 929 [236 Cal.Rptr. 803]; *People v. Diaz* (1984) 152 Cal.App.3d 926, 934 [200 Cal.Rptr. 77].) Simpson did not contend nor produce any evidence, in either his motion for mistrial or subsequent motion for a new trial, that Juror No. 7 communicated to the other jurors any outside information or otherwise committed any deliberative misconduct. He relies solely on the legal presumption of prejudice.

But the presumption of prejudice from juror misconduct "is not conclusive; it may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to

determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Hasson v. Ford Motor Co., supra*, 32 Cal.3d at p. 417.) Our examination of the entire record shows there is no reasonable probability of actual harm to Simpson, because the offending juror was removed and replaced by an alternate, and the newly-constituted jury began deliberations anew before rendering the verdict. The presumption of prejudice is rebutted by the fact of the timely removal of the offending juror.

When juror misconduct is discovered before a verdict is reached, the trial court has a choice among several remedies, one of which is to discharge the offending juror and replace the juror with an alternate. (Code Civ. Proc., § 233; *Garden Grove School Dist. v. Hendler* (1965) 63 Cal.2d 141, 145 [45 Cal.Rptr. 313, 403 P.2d 721]; Wegner et al., Practice Guide: Civil Trials and Evidence (The Rutter Group 1999) ¶ 15:266, p. 15-46.) Ordinarily the less drastic remedy is preferable to requiring a whole new trial; the remedy of mistrial is for those rare cases where the trial court in its discretion concludes the misconduct of the juror has already caused such irreparable harm that only a new trial can secure for the complaining party a fair trial. (Wegner et al., *supra*, ¶¶ 12:186, 12:189, 12:192, 15:265, 15:271, pp. 12-37, 12-38, 12-39, 15-46; 2 Cal. Trial Practice: Civil Procedure During Trial (Cont.Ed.Bar 3d ed. 2000) § 17.26, p. 1059; Cal. Judges Benchbook: Civil Trials (CJER 1981) Mistrials, § 10.4, p. 328; 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 181, p. 208.) Simpson offers no reason or argument why the remedy of removing the juror was not sufficient to remedy the harm in this particular case. The trial court did not abuse its discretion in denying a mistrial.

In the cases cited by Simpson the offending juror had joined in rendering the verdict. Here the offending juror was not included among the 12 jurors who rendered the verdict after being instructed to begin deliberations anew. In the absence of any evidence that the offending juror's previous temporary participation in deliberations tainted the other jurors, this record wholly rebuts the presumption of prejudice on which Simpson relies. (See *Glage v. Hawes Firearms Co.* (1990) 226 Cal.App.3d 314, 323, fn. 5 [276 Cal.Rptr. 430]; *People v. Dorsey* (1995) 34 Cal.App.4th 694, 704 [40 Cal.Rptr.2d 384].) "[T]he showing of misconduct is rebutted by an examination of the record which reveals no substantial likelihood that [Simpson] was given anything less than a full and fair consideration of [his] case by an impartial jury." (*Hasson v. Ford Motor Co., supra*, 32 Cal.3d 388, 417.)

COMPENSATORY DAMAGES FOR RUFO AND GOLDMAN

Sharon Rufo and Fredric Goldman, the parents of Ronald, were awarded compensatory damages of $8.5 million on their action for wrongful death.

The jury rendered this award under proper instructions that for wrongful death the heirs are entitled to reasonable compensation for the loss of love, companionship, comfort, affection, society, solace, or moral support suffered as a result of the death, but not for their grief or sorrow or for the decedent's pain and suffering. (Code Civ. Proc., § 377.61; *Krouse v. Graham* (1977) 19 Cal.3d 59, 67-78 [137 Cal.Rptr. 863, 562 P.2d 1022]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1424, p. 904; BAJI No. 14.50.)[13]

Simpson contends the amount of $8.5 million is excessive, in other words that the evidence concerning the parents' loss is insufficient to justify the jury's verdict in such a large amount. He contends that Sharon Rufo's relationship with Ronald was not particularly close and affectionate, and even if Goldman's relationship with Ronald was close and affectionate, it does not justify an award of $8.5 million for the loss of comfort from an adult son who was living independently away from the parental home at the time of death.

Simpson urged this point in a motion for new trial on the ground of excessive damages, which the trial court considered and denied.

We have very narrow appellate review of the jury's determination of the amount of compensation for the parents' loss of comfort and society. First, the contention that the evidence does not support the verdict is reviewed under the substantial evidence standard. In reviewing a claim of insufficiency of evidence, the appellate court must consider the whole record, view the evidence in the light most favorable to the judgment, presume every fact the trier of fact could reasonably deduce from the evidence, and defer to the trier of fact's determination of the weight and credibility of the evidence. (*DiRosario v. Havens* (1987) 196 Cal.App.3d 1224, 1240 [242 Cal.Rptr. 423]; *Fagerquist v. Western Sun Aviation, Inc.* (1987) 191 Cal.App.3d 709, 727 [236 Cal.Rptr. 633].) Second, the appellate court ordinarily defers to the trial court's denial of a motion for new trial based on excessive damages, because of the trial judge's greater familiarity with the case. (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1067 [232 Cal.Rptr. 528, 728 P.2d 1163].) The trial judge has greater discretion to reduce the damages on a motion for new trial than the appellate court has on appeal. If the trial judge denied the motion, concluding the award was not excessive, the appellate court gives weight to the trial court's conclusion. (*Bertero v. National General Corp., supra,* 13

---

[13]Under the trial court's instructions the jury awarded one sum in the aggregate for the present value of all losses suffered by both heirs. The amount was divided between Sharon Rufo and Fredric Goldman pursuant to their stipulation.

Cal.3d at p. 64; *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506-507 [15 Cal.Rptr. 161, 364 P.2d 337].) Third, the amount which may compensate the loss of comfort and society is peculiarly within the discretion of the jury. There is no fixed standard by which the appellate court can determine whether the jury's award for this intangible loss is excessive. The appellate court usually defers to the jury's discretion in the absence of some other factor in the record, such as inflammatory evidence, misleading instructions or improper argument by counsel, that would suggest the jury relied upon improper considerations. (*Bertero v. National General Corp., supra,* 13 Cal.3d at p. 64; *Fagerquist v. Western Sun Aviation, Inc., supra,* 191 Cal.App.3d at pp. 728-729; *Wright v. City of Los Angeles* (1990) 219 Cal.App.3d 318, 355-356 [268 Cal.Rptr. 309].) The appellate court will interfere with the jury's determination only when the award is so disproportionate to the injuries suffered that it shocks the conscience and virtually compels the conclusion the award is attributable to passion or prejudice. (*DiRosario v. Havens, supra,* 196 Cal.App.3d 1224, 1241-1242.)

 Here, Fredric Goldman testified about his close and affectionate relationship with Ronald, which continued to the time of the death. He testified they saw each other often and Ronald attended family gatherings regularly, particularly enjoying his role of big brother to his sister and extended family. As Simpson points out, Sharon Rufo's relationship with Ronald was much less close and regular. She and Fredric Goldman divorced in 1974 when Ronald was about six years old, and she shared child visitation from 1976 to 1982; but then Fredric Goldman and the two children moved to California from Illinois; she never saw Ronald again, had only two phone calls from him and sent him two letters. The jury award, however, was in the aggregate with no allocation between the father and mother. The award was for an intangible loss peculiarly within the discretion of the jury to determine. Simpson points to no other factor in the record to support the claim that the award must have been produced by passion or prejudice. The trial court properly instructed the jury, including specific advice that the jury must not consider the parents' grief or sorrow or the decedent's pain and suffering. The legal presumption is the jury followed the instructions. The trial court did not believe the award to be excessive. Although the verdict is very large, this alone does not compel the conclusion the award was attributable to passion or prejudice. "That result which requires reversal should clearly appear from the record. We are unable to say, as a matter of law, that the judgment in this case is so excessive as to warrant us in interfering with the finding of the jury." (*DiRosario v. Havens, supra,* 196 Cal.App.3d 1224, 1241-1242.)

Simpson's argument on appeal essentially comes down to this: the largest award his counsel could find in California reported cases for the loss of

comfort and society in the wrongful death of an adult child was $2 million, citing *Wright v. City of Los Angeles, supra,* 219 Cal.App.3d 318 (a 1990 appellate decision upholding a 1985 verdict of $2 million involving a 1979 death). This method of attacking a verdict was disapproved by our Supreme Court in *Bertero v. National General Corp., supra,* 13 Cal.3d 43, 65, footnote 12, where it said, "Defendants have compiled a lengthy list of judgments awarding damages which have been reversed on appeal as excessive. Those cases do not, in and of themselves, mandate a reversal here. The vast variety of and disparity between awards in other cases demonstrate that injuries can seldom be measured on the same scale. The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact. For a reviewing court to upset a jury's factual determination on the basis of what other juries awarded to other plaintiffs for other injuries in other cases based upon different evidence would constitute a serious invasion into the realm of factfinding. . . . Thus, we adhere to the previously announced and historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice on the part of the jurors. We cannot conclude that the award of damages could be so characterized in the instant case." (See *Wright v. City of Los Angeles, supra,* 219 Cal.App.3d at p. 356, citations omitted [rejecting the defendants' citation of a different wrongful death verdict in another case].)

## PUNITIVE DAMAGES

The jury awarded punitive damages of $12.5 million to Ronald's estate and $12.5 million to Nicole's estate. ■■■ Punitive damages are awardable to the decedent's estate in an action by the estate representative based on the cause of action the decedent would have had if he or she had survived. (Code Civ. Proc., § 377.34.) Relatively minor compensatory damages, such as here the decedents' clothing and personal property damaged during the homicides, can be the springboard for substantial punitive damages. (*Garcia v. Superior Court* (1996) 42 Cal.App.4th 177, 186 [49 Cal.Rptr.2d 580].)[14]

Simpson contends the trial court erroneously admitted evidence of the present value of projected income Simpson could earn on his name and

---

[14]Code of Civil Procedure section 377.34 provides, "In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement."

Punitive damages are not awardable to the heirs on their own cause of action for wrongful death. (Code Civ. Proc., § 377.61; *Garcia v. Superior Court, supra,* 42 Cal.App.4th at pp. 186-187 & fn. 7.)

likeness for the rest of his life. Simpson also contends that, even taking this value into account, the amount of punitive damages awarded was excessive as a matter of law. There is no merit to these contentions.

*Factual Background*

Plaintiffs presented two witnesses concerning the amount of punitive damages. One was an expert on the marketing of celebrities' names and likenesses, the other was a certified public accountant who evaluated Simpson's financial condition.

Mark Roesler is chairman and chief executive officer of CMG Worldwide, which is engaged in marketing and licensing for sports and entertainment personalities and the estates of deceased personalities. He stated his firm is the biggest company representing the estates of the famous personalities of the 20th century. His firm negotiates contracts that utilize the name or likeness of the personality, running the gamut of ways to exploit them, including appearances, autographs, merchandising, book deals, and media uses. His firm also helps to secure trademark protection and to prevent unauthorized uses of the celebrity's name and likeness.

Roesler prepared a financial estimate of the income Simpson could earn for the rest of his life from his name and likeness. He studied documentation, including trademarks Simpson had obtained or attempted to obtain, lawsuits Simpson had filed to prevent unauthorized use of his name or likeness, the current market for Simpson autographs, and contracts Simpson had entered since the date of the killings. He considered seven areas of potential: autographs, merchandise or memorabilia, endorsements, media, books and tapes, movies, and personal property actually owned by Simpson. Roesler opined that by using his best efforts in all these areas of potential exploitation, Simpson could earn $2 million to $3 million a year for the rest of his life. Based on all the materials he reviewed, Roesler had no doubt that Simpson's name and likeness had a substantial value in the current market of $2 million to $3 million a year. This was not an unusually large amount for sports personalities, he opined, as there were already 20 living sports personalities making at least that much income in those areas. In Roesler's opinion $25 million was a reasonable amount that a reasonable person in Roesler's business would pay in present dollars for the exclusive right to use Simpson's name and likeness for the rest of Simpson's life. The trial court admitted Roesler's testimony into evidence over Simpson's objection that it was not a proper element of net worth for jury consideration on the issue of punitive damages.

Neill Freeman is a consultant and certified public accountant who has testified numerous times as an expert accountant. He reviewed Roesler's

report and Roesler's opinion that Simpson could earn $2 million to $3 million a year for the rest of his life exploiting his name and likeness. Based on Roesler's estimate, Freeman calculated the present value of the exclusive right to exploit Simpson's name and likeness for the rest of Simpson's life. Freeman found the present value of that right to be just under $25 million. In Freeman's opinion as a forensic accountant, it is proper to include this amount in a statement of Simpson's current net worth. It "gives a complete picture of what the prospects or financial condition of Mr. Simpson is.'"

Freeman also reviewed the documents provided by the defense in discovery concerning Simpson's financial condition. In his opinion the defense versions of financial statements of Simpson's net worth were incomplete and unsatisfactory in various respects, including failure to account for income, exaggeration of tax liabilities, and discrepancies of millions of dollars between financial statements made for the purpose of obtaining bank loans, and financial statements made for the purpose of this litigation.

Based on his review and corrections of the financial statements, Freeman opined that Simpson's net worth at the time of trial was $15,703,529. Freeman's estimate on the asset side included $24,880,568 for the present value of the exclusive right to exploit Simpson's name and likeness, which was about 90 percent of Freeman's estimate of assets. Liabilities brought his estimate of Simpson's net worth down to the $15.7 million. This did not take into account the $8.5 million that the jury had just awarded to Rufo and Goldman for compensatory damages, which if subtracted would bring net worth down to $7,203,529.

Simpson presented four witnesses concerning punitive damages. These were his business manager and his accountant, and two dealers in sports memorabilia. Simpson attempted to show he had a negative net worth and had no viable prospects for earnings in the future exploiting his celebrity.

Simpson's personal attorney, business attorney and business manager Leroy Taft, testified Simpson's net worth at the time of trial was a negative $856,000, which would be a negative $9.356 million if the recent $8.5 million compensatory damages were deducted. He testified that since the murders Simpson had basically been selling assets to pay expenses. Taft testified that over the past year Taft had vigorously attempted to market Simpson memorabilia and autographs, to secure personal appearance contracts, to secure a book deal based on the criminal trial, and to market a video, all without significant commercial success. In his opinion Simpson was no longer marketable as a sports personality and his prospects for obtaining any kind of contract were negligible. Furthermore, Simpson had never in the past listed his name and likeness as an asset on a balance sheet.

Marvin Goodfriend is a certified public accountant who has worked 15 years for Simpson. In his opinion Simpson had a negative net worth of $856,000, which would be a negative $9.356 million after deducting the compensatory damages recently awarded. Goodfriend opined that he did not know if it was proper under generally accepted accounting principles to include the present value of one's name and likeness as an asset on a statement of net worth, but he believed it would be speculative if there were no present contracts supporting an estimate of such income in the future.

Simpson has two pension plans with a combined value of $4,121,000. According to the evidence, these pension plans are exempt from execution by creditors including plaintiffs as judgment creditors of a judgment awarding punitive damages. In addition, Simpson has a pension from the NFL, which in 2002 will begin paying him $1,910 per month; plaintiff's expert calculated its present value as $175,592.

Two dealers in sports memorabilia testified for the defense. Bruce Fromong is a full-time employee of the California Department of Corrections but also is self-employed as a dealer in sports memorabilia and part owner of a sports card shop in Lincoln City, Oregon. He directed sales and marketing for Locker 32, a company that deals primarily in Simpson memorabilia. During the criminal trial there was a frenzy of demand for Simpson memorabilia, but a few months after the criminal verdict this demand subsided. He testified that in the six months prior to this trial (February 1997) he had sold only 10 pieces wholesale and four pieces retail. At a recent trade show he could not find a single dealer interested in purchasing Simpson memorabilia. Larry Levine is owner of a sports memorabilia shop in Manhattan Beach, California. Prior to the killings the market for Simpson memorabilia was very hot. After the criminal verdict it collapsed. He sold only one autographed picture of Simpson in the year and a half prior to trial. He described the current market as ice cold. Although Levine still has Simpson memorabilia in the storeroom of his shop, he no longer displays it due to negative reaction from his customers.

Following the jury verdicts awarding punitive damages of $25 million, Simpson moved for a new trial on the ground among others that the punitive damages were excessive. The trial court denied the motion. It found the punitive damages were not excessive in light of the reprehensibility of Simpson's conduct, the harm suffered by the victims, credible evidence that Simpson had a reasonable expectation of receiving millions of dollars with a present value of $25 million, and Simpson's exempt assets.

*General Principles Governing Punitive Damages*

 Our Supreme Court has summarized the fundamental principles of punitive damages under California law. The purposes of punitive damages

are to punish the defendant and deter the commission of similar acts. (Civ. Code, § 3294, subd. (a) ["for the sake of example and by way of punishing the defendant"]; *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928, fn. 13 [148 Cal.Rptr. 389, 582 P.2d 980].) Three primary considerations govern the amount of punitive damages: (1) the reprehensibility of the defendant's conduct; (2) the injury suffered by the victims; and (3) the wealth of the defendant. (*Id.* at pp. 928-929.) As to the wealth of the defendant, the function of deterrence "will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort"; conversely, "the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." (*Id.* at p. 928.)

To enable an appellate court to review whether punitive damages are excessive, the record must contain "evidence of the defendant's financial condition." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348].) Because the important question is whether the punitive damages will have the deterrent effect without being excessive, an award that is reasonable in light of the first two factors, reprehensibility of the defendant's conduct and injury to the victims, may nevertheless "be so disproportionate to the defendant's ability to pay that the award is excessive" for that reason alone. (*Id.* at p. 111.) "[T]he purpose of punitive damages is not served by financially destroying a defendant. The purpose is to deter, not to destroy." (*Id.* at p. 112.)

### *Admissibility of Roesler Testimony*

Simpson contends the trial court should not have admitted Roesler's testimony into evidence. Simpson contends Roesler's analysis was legally "irrelevant" and for that reason was inadmissible. Simpson also criticizes the testimony as "speculative." The first argument is wrong legally. The second argument impermissibly attempts to have the appellate court reweigh the credibility of conflicting evidence.

Simpson first contends that his ability to earn income in the future is irrelevant and impermissible as a factor to be considered by the jury in assessing punitive damages. He appears to contend that his wealth, financial condition, or ability to pay punitive damages must be assessed solely upon whatever hard assets he possessed at the time of trial, as shown by a net worth statement, with no regard to future financial condition.

The simple answer to this contention is the evidence at trial contradicts it. Plaintiffs' accounting witness, Freeman, testified that in his expert opinion it

was proper under accounting principles to reflect in a net worth statement the present value of Simpson's ability to exploit his name and likeness in the future; Simpson's expert accounting witness Goodfriend did not contradict this in principle. Plaintiffs' other witness, Roesler, testified the right to exploit Simpson's name and likeness had a present market value, for which a person in Roesler's business would pay. Therefore, even based on Simpson's argument that present net worth is the only permissible measure of wealth, the evidence supported including this item as a component of present net worth.

Furthermore, although net worth is the most common measure of wealth used in assessing punitive damages, it is not the exclusive measure. (*Adams v. Murakami, supra*, 54 Cal.3d at p. 116, fn. 7 [declining to adopt any rigid formula, such as net worth, to measure the defendant's ability to pay]; *Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064-1065 & fns. 2, 3 [16 Cal.Rptr.2d 811] [defining financial condition, concluding that earnings *alone* is not sufficient evidence of financial condition]; *Kenly v. Ukegawa* (1993) 16 Cal.App.4th 49, 57 & fns. 6, 7 [19 Cal.Rptr.2d 771] [some evidence regarding liabilities must be offered; the defendant's profit on the fraudulent transaction, *alone*, is not sufficient evidence of financial condition]; *Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1152 [82 Cal.Rptr.2d 143] [income standing alone or wrongful profit standing alone is not sufficient evidence; there must be "meaningful evidence" "of the defendant's ability to pay the damage award"].) In *Adams, supra*, 54 Cal.3d 105, the Supreme Court primarily used the more general terms "financial condition" or "ability to pay" instead of "net worth."

Simpson cites cases for the proposition that the defendant's wealth should be measured as of the time of trial. These cases held only that an earlier time period should not be used. (*Marriott v. Williams* (1908) 152 Cal. 705, 710 [93 P. 875] [proper to show defendant's wealth at the time of trial, not the time when defendant inflicted the injury]; *Zhadan v. Downtown Los Angeles Motor Distributors, Inc.* (1979) 100 Cal.App.3d 821, 839 [161 Cal.Rptr. 225] [time of second trial should be used, not time of first trial or time of injury]; *Washington v. Farlice* (1991) 1 Cal.App.4th 766, 777 [2 Cal.Rptr.2d 607] [upon appellate reversal of punitive damages judgment and remand for a new trial, the defendant's financial condition at the time of retrial should be used].) These cases do not hold that a defendant's future financial prospects are legally irrelevant or improper for the jury to consider.

Simpson's contention that evidence of his future financial prospects is legally irrelevant or improper makes no sense. The ultimately proper level of punitive damages is an amount not so low that the defendant can absorb it

with little or no discomfort (*Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d 910, 928), nor so high that it destroys, annihilates, or cripples the defendant. (*Adams v. Murakami, supra*, 54 Cal.3d 105, 112, 113; *Kenly v. Ukegawa, supra*, 16 Cal.App.4th 49, 57.) Whether the defendant's financial prospects are bleak or bright is relevant to the ultimate issue whether the damages will ruin him or be absorbed by him. Simpson cites no authority that squarely supports his contention. In propounding a Model Punitive Damages Act, the Uniform Law Commissioners considered the law to be obviously contrary to Simpson's argument. Section 7(a) of the act lists nine factors to be considered by a jury in determining what constitutes a fair and reasonable amount of punitive damages. The commissioners endeavored "to list those factors which are relatively noncontroversial and which would probably come into play in most cases involving a claim for punitive damages." The fourth factor listed is, "the defendant's present *and future* financial condition and the effect of an award on each condition." (14 West's U. Laws Ann. (Master ed. 2000 supp.) Model Punitive Damages Act, § 7, subd. (a)(4), and com. thereto, pp. 53, 63, 64, italics added.) In *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381 [202 Cal.Rptr. 204], the court affirmed a punitive damages verdict against a corporation based in part on a corporate resolution to borrow money. It said a corporate resolution to borrow "serves as an indicator of the continuing health and viability of a business." (*Id.* at p. 391.)

Simpson next contends that even if his ability to earn money in the future was relevant, Roesler's testimony should have been excluded as "grossly speculative." Simpson argues that Roesler compared Simpson to other famous sports celebrities without confronting the negative effects stemming from the findings in this case that he killed the victims or the evidence from the defense witnesses that the demand for Simpson's services or products had fallen off. This argument confuses weight and credibility of evidence with admissibility of evidence. Whether Roesler's evaluation of Simpson's future income potential was credible was an issue of fact for the jury. The appellate court cannot reweigh the credibility of witnesses or resolve conflicts in the evidence. (*Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1535-1536 [51 Cal.Rptr.2d 311].) The appellate court must view the conflicting evidence regarding punitive damages in the light most favorable to the judgment pursuant to the familiar substantial evidence rule. (*Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d 910, 928.) Roesler was well qualified by his experience to render an opinion on the value of a celebrity's name and likeness. Contrary to Simpson's present argument, Roesler did not ignore negative publicity. He discussed how the value of Simpson's autographed pictures went up during the criminal trial and had remained at that level since. He discussed how the value of Mike Tyson

memorabilia increased even after Tyson's conviction of rape. He opined there was a definite market for Simpson autographs unaffected by the outcome of this trial. He said Simpson has a very high level of recognition throughout the world, and there were many people who want a Simpson product or autograph. In his written report, which was admitted into evidence, he discussed the phenomenon that value is based more on fame and notoriety than on good, quoting, " 'We live in a society where the line between celebrity and infamy has almost disappeared. What matters most is fame and it is not terribly important how you get famous.' " The report noted that Simpson's past accomplishments in sports were well established, and opined that Simpson had an appeal in international and ethnic markets unaffected by the opinion of others that he committed these murders. The conflict between this evidence and the defense evidence that the market for Simpson memorabilia and services had dried up was for the jury to resolve. In denying the motion for new trial, the trial court called plaintiffs' evidence credible.

### Amount of Punitive Damages

▮ Simpson contends the verdict totaling $25 million in punitive damages is excessive. The amount of punitive damages is determined in the discretion of the jury. ▮ An appellate court will not reverse the jury's determination unless the award as a matter of law is excessive or appears so grossly disproportionate to the relevant factors that it raises a presumption it was the result of passion or prejudice. (*Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 927-928; *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1257-1259 [1 Cal.Rptr.2d 301].) In reviewing the verdict the appellate court is guided by three main factors: the reprehensibility of the defendant's conduct, the actual harm suffered by the victims, and the wealth of the defendant. (*Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928; *Las Palmas Associates v. Las Palmas Center Associates, supra,* 235 Cal.App.3d at p. 1258.)[15]

▮ Review of these factors in the unique circumstances of this case shows that the verdict was not the result of passion or prejudice and was not excessive as a matter of law.

In this case the first two factors, the reprehensibility of the defendant's conduct and the severity of harm to the victims, have the greatest weight

---

[15]In an action by the representative of a decedent's estate, the punitive damages must be compared to the actual harm suffered by the decedent, not the limited economic damages recoverable by the estate. (*Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 929; *Gagnon v. Continental Casualty Co.* (1989) 211 Cal.App.3d 1598, 1602-1605 [260 Cal.Rptr. 305].)

legally possible. In effect the jury found that Simpson committed two deliberate, vicious murders. This is the most reprehensible conduct that society condemns and is ordinarily punished under California criminal law by a sentence of death or life imprisonment without possibility of parole. (Pen. Code, §§ 187, 189, 190, subd. (a), 190.2, subd. (a)(3); see *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 583 [116 S.Ct. 1589, 1603, 134 L.Ed.2d 809] [suggesting comparing the punitive damages to statutory criminal and civil penalties for comparable misconduct].) The harm suffered by the victims was the maximum possible; they were intentionally killed. This case cannot be compared to punitive damages involving a business fraud resulting only in economic harm. Considering the outrageousness of Simpson's conduct and the enormity of its consequences, the amount of $25 million, in the abstract, is not offensive and does not raise a presumption the verdict resulted from passion or prejudice.[16]

Simpson does not address the first two factors, only the third, the relationship of the amount of punitive damages to his wealth. He relies on the language in *Adams v. Murakami, supra,* 54 Cal.3d 105, 111, that, "Even if an award is entirely reasonable in light of the [first] two factors . . . , the award can be so disproportionate to the defendant's ability to pay that the award is excessive *for that reason alone.*" He contends the award of $25 million exceeds even plaintiffs' estimate of his net worth as $15.7 million. He contends that because appellate courts have sometimes reversed punitive damage awards exceeding a given fraction of the defendant's net worth, an award exceeding net worth is necessarily excessive as a matter of law.[17]

This contention is unpersuasive in the unusual circumstances of this case. Although net worth is the most common measure of the defendant's financial condition, it is not the only measure for determining whether punitive damages are excessive in relation to that condition. (*Adams v. Murakami,*

---

[16]A few cases involving punitive damages assessed against a civil defendant found to have murdered the decedent are collected in an annotation (1993) 12 A.L.R.5th 195, section 29[b], page 361, and later cases (2000 supp.) page 26. One of these, without specifically discussing the defendant's financial condition, affirmed a punitive damage award of $5 million, concluding it did not indicate jury passion or prejudice and was not unreasonable considering the character of the wrong. (*Armstrong v. Randle* (Tex.App. 1994) 881 S.W.2d 53, 59.)

[17]Simpson cites *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1596 [36 Cal.Rptr.2d 343] (punitive damages of 28 percent of net worth found excessive), and *Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498, 515-516 [262 Cal.Rptr. 689] (punitive damages of 33 percent of net worth found excessive). The other cases cited by Simpson discuss the concept of punitive damages as a percentage of net worth but either affirmed the particular verdict or reversed on the different ground that the plaintiff had failed to offer requisite evidence of the defendant's net worth. (*Adams v. Murakami, supra,* 54 Cal.3d 105; *Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d 910; *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc., supra,* 155 Cal.App.3d 381; *Washington v. Farlice, supra,* 1 Cal.App.4th 766; *Kenly v. Ukegawa, supra,* 16 Cal.App.4th 49.)

*supra*, 54 Cal.3d at p. 116, fn. 7; *Lara v. Cadag, supra*, 13 Cal.App.4th 1061, 1064-1065 & fn. 3 [net worth is subject to easy manipulation, and blind adherence to that or any single standard could lead to awards that fail to deter and punish, or deter and punish too much].) Furthermore, the court that compiled a list of cases in an attempt to discover a formula for determining whether a given percentage of net worth is excessive ultimately concluded there is no formula, and that each case must be decided on its own facts, considering all three factors and various indicators of wealth. (*Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc., supra*, 155 Cal.App.3d 381, 388-389, 391-392; *Vallbona v. Springer, supra*, 43 Cal.App.4th 1525, 1539-1540.)

The evidence here, viewed in the light most favorable to the judgment, shows that Simpson is a wealthy man, with prospects to gain more wealth in the future. The enormity of his misconduct shows that a large amount of punitive damages is necessary to punish him and deter him. There is no formula based on net worth for determining what amount is too much. The fundamental underlying principle is that punitive damages must not be so large they destroy the defendant. Evidence unique to this case shows this award will not destroy Simpson economically. He has pension funds worth $4.1 million that are exempt from execution to pay this award. Despite the award of punitive damages Simpson can continue to enjoy a comfortable living. In *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc., supra*, 155 Cal.App.3d 381, the court affirmed a punitive damages award against a corporate car dealer for a single fraudulent sale of a car with a turned-back odometer. The award was 17.5 percent of the dealer's net worth. Despite the fact that this fraction exceeded the fraction in previous cases it surveyed, the court affirmed, noting "[t]here is nothing in the financial data presented which suggests the award will unduly interfere with or hamper Kearny Mesa's future operations." (*Id.* at p. 391.) In *Vallbona v. Springer, supra*, 43 Cal.App.4th 1525, the defendant doctor misrepresented to patients the effectiveness or legality of a surgical procedure. The punitive damages award of $200,000 was 23 percent of the net worth of the doctor and his wife. The court affirmed, noting that the award still "left them with $666,000, almost 77 percent of their demonstrated net worth." (*Id.* at p. 1540.) Here the fact that the punitive damages award technically exceeds net worth is not controlling, because in light of the exempt nature of a significant part of his wealth, Simpson will not be destroyed by the award. Considering all the factors, the punitive damages award, "in light of the defendant's wealth and the gravity of the particular act," does not exceed "the level necessary to properly punish and deter." (*Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d at p. 928.)

## DISPOSITION

The judgments are affirmed.

Epstein, J., and Hastings, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 25, 2001.