Filed 6/12/14  Musetti v. Buckley CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DANIEL MUSETTI,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>        v.<br><br>EVAN BUCKLEY et al.,<br><br>    Defendants, Cross-complainants and Respondents. | G049504<br><br>(Super. Ct. No. RIC430222)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Harold W. Hopp, Judge.  Affirmed.

Vivoli Saccuzzo, Michael W. Vivoli and Jason P. Saccuzzo for Plaintiff, Cross-defendant and Appellant.

Wesierski & Zurek, Christopher P. Wesierski, Laura J. Barns and Ronald F. Templer for Defendants, Cross-complainants and Respondents.

*          *          *

This is a dispute between partners in various real estate ventures. Plaintiff Daniel Musetti sued defendant Evan Buckley, his former partner in various real estate ventures, over the proceeds to those ventures. This appeal primarily concerns their respective partnership interests in a parcel of land known as Santa Fe Ranch (the Ranch). Musetti also sued Perseid Land Capital, LLC (Perseid), the limited liability company holding title to the Ranch.

At the conclusion of the jury portion of the trial, the jury concluded Musetti and Buckley had entered into an 85/15 partnership, with Buckley owning the majority share. Musetti argues this finding is not supported by substantial evidence, and he is entitled to an equal share of the profits. Based on the evidence presented, we disagree and conclude that the jury's conclusion was indeed supported by substantial evidence.

After the jury portion of the trial, an equitable phase went forward, and the court ultimately awarded $400,000 to Buckley. Musetti argues this award was contrary to the jury's verdict and was issued in the absence of an equitable cause of action. As we will discuss, we disagree and affirm the equitable award as well.

I

FACTS AND PROCEDURAL HISTORY

*Summary of Underlying Facts*

In the interests of brevity and simplicity, we provide an overview of the facts here, and add additional details as necessary in our discussion.

Musetti and Buckley knew each other since childhood. They maintained a friendship over the years. As an adult, Musetti eventually formed his own construction company. Buckley was a licensed real estate broker and founded a mortgage company, which he sold in 1999.

Around 2000, Musetti sought to purchase property in Riverside County, but discovered the property he was interested in had an issue with unpaid property taxes. He

2

spoke to Buckley about it, and they learned that because there had been a change in the law, there was an opportunity to earn money by purchasing land at tax auctions. They orally agreed to purchase properties at tax auctions, whereby Musetti would locate the properties and Buckley would pay for them. Buckley's outlay plus 5 percent would be returned to him, after which any further profits would be split equally. This was later referred to as "the tax property partnership."

This endeavor proceeded from 2001 to 2003, with the tax property partnership purchasing a total of about 26 properties for approximately $480,000. In addition to purchasing the properties, Buckley paid various other costs for work done on some of the properties. The sales and costs varied, and by 2004, Buckley told Musetti the partnership was close to becoming profitable, but some unsold properties continued to incur expenses.

In 2003, Musetti learned of 2,800 acres for sale in Hemet, the parcel known as the Ranch. It was owned by University of California, Santa Barbara (USCB) at the time, and the asking price was $3.95 million. He submitted an offer to purchase for $3.2 million in the name of "Daniel K. Musetti and Company or assignee." UCSB accepted. Escrow was intended to close 40 days after it opened.

After the purchase contract was signed, Musetti was required to make a $50,000 deposit, which he obtained from Buckley. Musetti began to look for investors, as he did not have the money to close. His real estate broker, Robert Howard, referred him to Merritt Charles Horning. Eventually, Horning dropped out, and according to Buckley, Musetti called him "in a panic" and said that his investor had backed out. When Buckley asked what deal Musetti had reached with the previous investor, Buckley testified that Musetti said I get "15 percent, and I get part of the management, but that does not matter now, because the deal is gone now."[1] This is the crux of the instant

---

[1] We will address an inconsistency with respect to this testimony *post*.

dispute — according to Musetti, he never had a prospective deal with Horning for 15 percent — his share was to be 50 percent after repaying the investment and expenses, and he understood the same deal was to be in effect with Buckley. According to Buckley, Musetti was to have a 15 percent interest in the property.

With these apparently different understandings, Buckley then invested the $3.2 million in the purchase of the Ranch. Buckley also spent an additional $200,000 on various expenses.

Prior to closing, Buckley and Musetti agreed to form a limited liability company, Perseid, that would hold title. The LLC papers were drafted by attorney William Conti, who had previously represented Musetti in other matters. Buckley was designated the managing agent for Perseid, but the draft operating agreement Conti prepared did not designate the respective ownership interests. The operating agreement was never signed. Escrow closed in September.

After close of escrow, there were numerous offers to purchase the Ranch, which the parties characterize very differently, but that dispute is not of much import here. The dispute leading to this lawsuit arose in January 2005, during a meeting to discuss partnership business. An argument ensued, and Musetti and Buckley fell out. Buckley subsequently listed the Ranch for sale, and this lawsuit followed.

*Procedural History*

In September 2005, Musetti filed his second amended complaint (the complaint) alleging causes of action for breach of contract, fraud, rescission, involuntary dissolution of the LLC, breach of fiduciary duty, accounting, constructive trust, equitable lien, specific performance, injunction, and quiet title. Buckley answered and filed a cross-complaint alleging various claims relating to the tax properties.

4

When the case went to trial in March 2009, the parties concluded their opening statements and then reached a settlement which was placed on the record before the trial judge. Under the settlement, Buckley agreed to pay into Perseid $400,000 to be used at Musetti's discretion. Control of Perseid was to be transferred to Musetti as managing member. Musetti was to have the right to acquire Buckley's interest in Perseid in exchange for $4 million, to be paid within two years. If unable to pay, Musetti would have the option to acquire Perseid for $4 million plus 20 percent of the profits, and in the event Musetti had not exercised this option within seven years, the parties agreed to sell the Ranch and split any profits evenly.

According to Musetti's later testimony, but not set forth in the settlement agreement as presented to the trial judge, it was a material understanding that there were no liabilities on the Ranch. In June 2009, Musetti claimed he learned, for the first time, that Buckley had not paid property taxes on the Ranch in five years, and the County of Riverside was preparing to foreclose. Musetti claimed Buckley concealed this material fact from him.

Musetti subsequently placed Perseid into chapter 11 bankruptcy protection. According to Musetti, Buckley submitted a reorganization plan that would negate the settlement agreement. The bankruptcy was ultimately dismissed, although Musetti claims he obtained an informal agreement from the county not to foreclose.

Musetti then brought a motion asking the court to either enforce the settlement agreement and require Buckley to pay the outstanding taxes, or to set the agreement aside entirely. Buckley opposed. Ultimately, the trial court concluded Buckley was not required to pay the outstanding taxes because to do so would add terms to the settlement agreement, but Musetti was not ordered to repay the $400,000 Buckley had paid as part of the settlement agreement. The court then vacated the settlement agreement, concluding there was no meeting of the minds.

On the day the "second trial" began, Buckley successfully moved to file an amended cross-complaint, asserting he was entitled to the $400,000 he had paid as part of the settlement agreement. The parties agreed, however, that no evidence of the settlement agreement would be offered.

The jury ultimately concluded that Musetti had a 15 percent interest in Perseid, and was entitled to 15 percent of the profits from the sale of the Ranch after the return of Buckley's investment plus seven percent interest. The jury found in Musetti's favor on most of Buckley's cross-complaint, including the conversion cause of action through which he sought return of the $400,000. Buckley was awarded approximately $14,000 on his cross-complaint.

After the jury concluded its work, the court proceeded to try the equitable claims. Musetti essentially asked the court to undo the jury's verdict and to find that rescission of his agreement to assign the Ranch to Perseid was proper. The trial court declined to do so. With regard to Buckley's claim, the court found there was no justification for Musetti to retain the proceeds of a vacated settlement, and ordered it returned. The court subsequently denied Musetti's motion for judgment notwithstanding the verdict.

II

DISCUSSION

*Substantial Evidence to Support the Jury's Verdict*

Musetti's first argument on appeal is that the jury's finding that Musetti owned 15 percent of the LLC while Buckley owned 85 percent is not supported by substantial evidence.

"When a party challenges the jury's findings based on insufficient evidence to support those findings, we apply the substantial evidence standard of review. [Citations.] In applying this standard of review, we 'view the evidence in the light most

favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.]" (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1096.) "'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citations.]" (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)

A party "raising a claim of insufficiency of the evidence assumes a 'daunting burden.' [Citation.]" (*Whiteley v. Philip Morris Inc.* (2004) 117 Cal.App.4th 635, 678.) We do not reweigh the credibility of witnesses or resolve conflicts in the evidence. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 622.) Accordingly, we only determine whether there was substantial evidence from which the jury could have reached the conclusions it did. We do not examine the evidence to see if there was sufficient evidence to support Musetti's version of the facts — that is simply irrelevant.

Further, "appellants who challenge the decision of the trial court based upon the absence of substantial evidence to support it "'are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed waived.' [Citations.]" [Citation.]" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Musetti, frankly, has failed in this regard, focusing heavily on the evidence that was favorable to his version of the facts. We would be within the law to deem the issue of substantial evidence waived, but in the interest of justice, we will address the argument on its merits.

Musetti testified that he did not have the $3.2 million needed to purchase the property. Howard, the realtor, introduced him to Horning as a potential investor. Buckley testified that when he first learned of the Ranch property, Musetti told him that he had a partner. Buckley was not interested in investing.

Horning and Musetti were still in negotiations in late July, while the Ranch was in escrow. A letter from Horning to Musetti stated: "If we are unable to work out

7

something to our mutual satisfaction and for whatever reason, and we proceed with the closing of escrow and the purchase of the property, we will pay you a fee of $100,000 at the close of escrow as a finder's fee." The intent was to keep Musetti as the "managing front person" of the property. Enclosed was a draft assignment from Musetti to Horning's corporation.

During cross-examination, Musetti stated there had been "a discussion about 15 percent, but that was 15 percent of the property" with Horning. He later stated "We had some discussion on 15 percent of the gross profit, and I would take title in my name on 15 percent of the property." He also testified there was another letter prior to the close of escrow referring to a 24 or 25 percent profit split. The only letter produced from Horning showing a potential 50/50 split between Horning and Musetti was dated in November 2003, months *after* Buckley funded the purchase of the Ranch. In March 2005, Musetti wrote to Horning claiming "Our agreement on the Santa Fe Ranch was your money back at 7% interest with you and I splitting the profit fifty/fifty," but there is nothing specific about when such an agreement was reached. Later in that letter, Musetti states, "I should have gone with the other offer because it gave me $100,000, a budget of $250,000 to $300,000 to work on the property and 24% of the gross . . . ."

Musetti argues that he "consistently testified" that he agreed to a 50/50 partnership with respect to the Ranch. Asserting that Buckley admitted this, he points to one question asked of Buckley regarding Musetti's deal with Horning, the prior potential investor. The transcript reflects, that when Buckley asked what Horning's deal with Musetti was, Musetti told him "50 percent plus the management." Buckley argues this was a transcription error and should have been 15 percent, but ultimately, this is of little import. Buckley testified numerous other times that Musetti told him the deal with Horning was 15 percent, including on the same day of trial as the "50 percent" statement, misstatement or mistranscription, however one chooses to characterize it. But it is

irrelevant what Musetti "consistently testified" to, even in light of a possible inconsistency in Buckley's testimony. The jury was free to believe Buckley over Musetti on this point, and a single inconsistency does not equate to a lack of substantial evidence.

Buckley's other testimony on this point was consistent with his claim of an 85/15 percent split.

"Q. . . . Did you understand there to be any other investors at the time that you entered the picture other than yourself?

"A. No.

"Q. Second, did you ever agree to the same deal with Mr. Musetti on Santa Fe Ranch as the deal you had on the tax sale properties?

"A. No.

"Q. Why not?

[¶] . . . [¶]

"A. When I asked Dan what his deal with his last investor was, that's what I assumed the deal was.

"Q. And was Santa Fe Ranch different than the tax sale properties?

"A. Yeah. That's my retirement money, $3.2 million cash, yes.

"Q. Had any of the tax sale properties come close to that amount of money?

"A. No. Most of them were purchased from [$]2 to 4,000, sometimes 25 [thousand]."

Thus, Buckley offered a plausible explanation as to why he would consider the Ranch purchase very differently from the earlier tax property purchases, and why he would want a different split of the profits.

Other witnesses also testified about Musetti's negotiations with Horning. Howard, the realtor, confirmed that Musetti told him that one of the deals proposed by

9

Horning, about midway through their negotiations, was an 85/15 split in Horning's favor. Musetti did not indicate that he did not want to proceed on those terms. Conti, Musetti's attorney, testified that Musetti told him Horning was only offering a finder's fee. Horning's offer was the "least palatable" due to these terms.

Musetti argues that under the Corporations Code, absent an express agreement otherwise, partnership profits are split equally, and no evidence of an agreement was offered. But there was evidence from which the jury could infer an express agreement. Buckley testified that either just prior to close or shortly thereafter, Musetti told him he had a different understanding of the term of their agreement than Buckley did. They discussed it, and Buckley did not recall the subject being raised again. Musetti admits the conversation took place, though he disputes what agreement they came to. The jury could reasonably accept Buckley's version and infer that Musetti had agreed to the 85/15 split.

Other facts bolster this conclusion. By January 2005, Musetti had begun withholding sales checks on the tax properties from Buckley, including three checks totaling more than $370,000. While withholding these funds, Musetti approached Buckley and offered to have an investor pay back the $3.2 million sales price, with Buckley and Musetti each having a 25 percent profit interest going forward, and the new investor 50 percent. Buckley felt this was an attempt to renegotiate the Ranch agreement using the tax properties as leverage. The jury could reasonably have concluded that Musetti knew he owned only a 15 percent interest in the Ranch and withholding the tax property money was a scheme to induce Buckley to give him a larger percentage.

A jury question asked Musetti why, when he was asked by Conti, the attorney completing the LLC operating agreement, about the percentage owned by each party, did Musetti state that it would be worked out, rather than indicating a 50/50 agreement if it already existed? Musetti answered: "At the time I was only talking to

10

Mr. Conti on the phone, and Mr. Buckley was not present. And Mr. Buckley needed to be present for me to have a discussion like that. I could not just say percentage. Just out of respect, I could not do it that way." The jury could, and did, find this statement lacking in credibility. If Musetti and Buckley previously had a 50/50 agreement, why was Buckley's input needed to simply memoralize it in a draft document? The jury was free to draw its own conclusions, and those conclusions were supported by substantial evidence.

But even if Musetti is correct and there was no agreement on the profit split, Buckley argues this matter is governed not by partnership law, but by the law applicable to LLC's.[2] "The profits and losses of a limited liability company shall be allocated among the members, and among classes of members, in the manner provided in the operating agreement. *If the operating agreement does not otherwise provide, profits and losses shall be allocated in proportion to the contributions of each member.*" (Corp. Code §17202, italics added.) Buckley argues that under this provision, as the sole contributor of capital to Perseid, he would be entitled to an interest in excess of 85 percent. Musetti argues that he contributed the "valuable contractual right" to purchase the Ranch, and then asserts he is therefore entitled to a 50 percent interest. But this is an entirely conclusory argument, and he fails to cite evidence demonstrating he contributed an equal amount of value to Perseid. As the plaintiff, it was his burden to demonstrate both the lack of an agreement and the monetary value of his contributions, and he failed to do so on both counts.

Musetti further argues that at a minimum, there was a mistake of fact and therefore no agreement on the division of profits. But Musetti's basis for rescission was

---

[2] Musetti argues that Buckley waived this issue by not advancing it at trial, without citing to the portions of the record demonstrating that Buckley's trial arguments rested on the partnership provisions of the Corporations Code. But ultimately, which statute applies is an issue of law that we may address here at our discretion.

11

the purported fraud perpetrated by Buckley, a theory thoroughly rejected by the jury. The jury decided that Buckley did not engage in fraud to induce Musetti to assign title to the Ranch to Perseid, and the jury's conclusions were supported by the evidence. Musetti also contends that an 85/15 agreement would have been unconscionable in light of the fiduciary relationship between Buckley and Musetti, but he failed to establish constructive fraud by Buckley, a theory rejected by the jury's factual findings. He also does not establish that enforcing the contract would be unconscionable in light of Buckley's 100 percent financial contribution to the purchase of the Ranch and his lack of knowledge of Musetti's purported mistake. In sum, the jury had substantial evidence from which it could readily conclude the parties had agreed to an 85/15 percent split of the profits from the Ranch.

*The Court's Equitable Ruling*

Musetti next takes issue with the court's ruling after the equitable phase of the trial. He argues that while the court felt constrained by the jury's ruling with respect to his request for rescission, it felt free to depart from it on Buckley's equitable claims, and the court's finding contradicts the jury's ruling.

The difference, however, is in the details. In the jury phase, Buckley argued he was entitled to $400,000 in a cause of action for conversion premised on the unreimbursed proceeds from sale of the tax properties. The jury decided he was entitled only to approximately $14,000. But in the equitable phase, Buckley argued that as a matter of equity, he was entitled to the $400,000 he paid to Musetti via Perseid as part of the vacated settlement. The jury was not aware of most of these facts, because the parties agreed the settlement would not be mentioned during trial. A redacted part of the settlement agreement was introduced over Buckley's objection, which may have

12

confused matters. The jury asked questions about why the $400,000 was paid, and the answers did not reference the settlement.

Given these facts, it is clear why the court did not feel constrained by the jury's factual findings on this point — the jury simply did not have all of the relevant facts, and two different theories, essentially, were being argued by Buckley. Buckley asserted multiple claims to support the return of the $400,000, including conversion, which the jury decided in Musetti's favor, and the equitable claims the court ruled on later, among them unjust enrichment, constructive trust, and accounting. It was entirely proper for the trial court to use additional facts to rule on these equitable claims, specifically, the existence of the vacated settlement.

Musetti next argues that none of the causes of action alleged support return of the $400,000. But what he ignores is that when a court sits in equity, it "may avail itself of powers broad, flexible and capable of being expanded to deal with novel cases and conditions. [Citation.]" (*MacFarlane v. Peters* (1980) 103 Cal.App.3d 627, 631.) An equitable decree is reviewed under the abuse of discretion standard, under which "we resolve all evidentiary conflicts in favor of the judgment and determine whether the court's decision '"falls within the permissible range of options set by the legal criteria."' [Citations.]" (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 771.)

Here, the court was within its discretion to decide that as a matter of equity, Musetti, by retaining the $400,000 paid as part of the settlement after it was vacated, was unjustly enriched at Buckley's expense. The elements of a claim of unjust enrichment are "receipt of a benefit and unjust retention of the benefit at the expense of another. [Citation.]" (*Lectrodryer v. SeoulBank* (2000) 77 Cal.App.4th 723, 726, see also *Elder v. Pacific Bell Telephone Co.* (2012) 205 Cal.App.4th 841, 857.) Frankly, we do not understand why this is even an open question. It is obvious that once a settlement is vacated, any benefits received as part of that settlement must be returned. The trial court

13

was therefore well within its discretion in ordering Musetti to return the proceeds from the vacated settlement.

III

DISPOSITION

The judgment is affirmed.  Buckley is entitled to his costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


IKOLA, J.

14